Filed 6/18/21  P. v. Morales CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

　　Plaintiff and Respondent,

v.

ROGELIO VERGARA MORALES et al.,

　　Defendants and Appellants.

E072462

(Super.Ct.No. RIF1701355)

OPINION

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr., Judge.

Affirmed in part; reversed in part and remanded for resentencing.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and

Appellant, Rogelio Vergara Morales.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and

Appellant Mireya Arias.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief

Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos

and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendants and appellants Rogelio Vergara Morales, an attorney, and Mireya Arias, his wife (collectively, defendants), concocted a plan to file gender discrimination lawsuits against minority owned hair salons and dry cleaners. Defendants went together to the hair salons and each received haircuts, they would pay for them and, if Arias paid more for her haircut, Morales would file a lawsuit against the business under Civil Code section 51.6, the Gender Tax Repeal Act of 1995 (Gender Act). They employed the same practice against dry cleaners, each dropping off a shirt, and if Arias was charged more than Morales for the cleaning, Morales would file a gender discrimination lawsuit pursuant to the Gender Act against the dry cleaning business. Morales contacted some of the businesses after filing suit and offered a settlement. Morales stalked an attorney who helped some of the victims defend against the lawsuits and who organized a demonstration against these gender discrimination lawsuits at Morales's law office; he also disobeyed a restraining order she had obtained. Arias filed a restraining order against the attorney and several other persons who were present at the protest. The restraining order was denied and the parties were awarded attorney fees. Morales sent a email to the attorney for the parties who defended the restraining order advising he would file a federal lawsuit if they pursued collection of the attorney fees.

Morales was convicted of 62 counts including extortion based on the filing of "unlawful" lawsuits and also for sending a threatening email, attempted extortion for trying to reach a settlement on these "unlawful" lawsuits, burglary, attempted theft, stalking, disobeying a restraining order, and the special allegation that filing these gender

discrimination lawsuits were hate crimes. Arias was convicted of 40 counts of extortion, burglary and attempted theft, along with the hate crime enhancements.

Defendant Morales claims on appeal that (1) insufficient evidence was presented to support his convictions of extortion for filing gender discrimination lawsuits; (2) insufficient evidence was presented to convict him of extortion for threatening a federal lawsuit if victims sought attorney fees; (3) the trial court erred in submitting the legal question of probable cause to file these gender discrimination lawsuits to the jury; (4) the extortion convictions based on filing gender discrimination lawsuits are unconstitutional and must be reversed because the extortion counts were presented to the jury on an invalid legal theory; (5) since he did not commit extortion, his conduct did not constitute attempted theft or burglary and the evidence was insufficient to support the verdicts for these crimes; (6) insufficient evidence was presented to convict him of filing a false instrument within the meaning of Penal Code section 115;; (7) insufficient evidence was presented to support the burglary convictions; (8) the hate crime enhancements must be reversed because the jury was not properly instructed on the definition of "bias motivation" for purposes of the hate crime statutes; (9) the restitution fines awarded for Luis Z., Alejandro C. and Bryan Owens must be reversed because the expenses submitted were not economic losses arising from the crimes; (10) the trial court erred in calculating the amount of restitution for pro bono legal fees; (11) the trial court used an improper rate in calculating the value of pro bono attorney fees; and (12) restitution for security upgrades in connected with his stalking conviction were not authorized by statute.

Defendant Arias contends (1) insufficient evidence was presented to support the extortion convictions or that she aided and abetted Morales in the extortion crimes, which also requires reversal of her convictions of burglary and attempted theft by false pretenses; (2) the trial court erroneously failed to instructed the jury on the affirmative defense of litigation privilege; (3) the trial court's instructions on gender discrimination were misleading and prejudicial; (4) the trial court's instructions on the hate crime allegation were misleading and lowered the prosecution's burden of proof; and (5) she joins in defendant Morales's arguments regarding the restitution fines. Morales joins Arias's arguments 1 though 3.

### FACTUAL AND PROCEDURAL HISTORY

A.    PROCEDURAL HISTORY

Morales was convicted of 62 counts involving numerous businesses and individuals. Morales was convicted of burglary (Pen. Code, § 459),[1] extortion (§ 523), attempted extortion (§ 524) and attempted theft (§§ 664, 187) against Xotic Image Hair Salon/Eva L.[2] (counts 1-4); Irish Cleaners/Omar T. (counts 5-8); Country Club Cleaners/Dae C. (counts 9-12); Latinas Hair Salon/Nelida D. (counts 13-16); Chic Hair Salon/Jose P. (counts 17-20); 786 Beauty Salon/Zafar R. (count 21-24); and Your Hair

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] We refer to victims and witnesses by their first names, with or without last initials, to preserve their anonymity. (Cal. Rules of Court, rule 8.90(b).) No disrespect is intended.

Center/Rosie Q. (counts 38-41). The jury found true for all counts the special allegations that they were hate crimes within the meaning of section 422.75, subdivision (a).

Morales was convicted of burglary (§ 459), extortion (§ 523) and attempted theft (§§ 664, 187) against Susie's Hair/Susie N. (counts 25-27); Crown Cleaners/Harshayu P. (counts 28-30); Alpha Cleaners/Francisca D. (counts 31-33); and Marcella's Barber Shop/Maricela L. (counts 35-37).[3] For all of these counts, the jury also found true the special allegations that these were hate crimes (§ 422.75, subd. (a)).

He was also found guilty of additional counts of extortion (§ 523) for Rosa Sahagun, Nelida D., Luiz Z., Rosie Q., Alejandro C. and Bryan Owens (counts 45-50). Morales was found guilty of stalking (§ 646.9; count 51), and 12 counts of disobeying a restraining order (§ 166, subd. (a)(4); counts 52-63) for acts he committed against Rosa Sahagun.

Defendant Arias was convicted of 40 counts. She was convicted of burglary (§ 459), extortion (§ 523) and attempted theft (§ 664, 487) against Irish Cleaners/Omar L (counts 5, 6, 8); Country Club Cleaners/Dae C. (counts 9, 10, 12); Latinas Hair Salon/Nelida D. (counts 13, 14, 16); Chic Hair Salon/Jose P. (counts 17, 18, 20); 786 Beauty Salon/Zafar R. (counts 21, 22, 24); Susie's Hair Salon/Susie N. (counts 25, 26, 27); Crown Cleaners/Harshayu P. (counts 28, 29, 30); Marcella's Barber Shop/Maricela L. (counts 35, 36, 37); and Your Hair Center/Rosie Q. (counts 38, 39, 41). In addition, she was found guilty of burglary (§ 459) and attempted theft (§§ 664, 487) against Xotic

---

[3] Count 34 was a charge of forgery pursuant to section 115, which was dismissed based on defendants' section 1118.1 motions.

5

Image/Eva L. (counts 1, 4); and extortion (§ 523) and attempted theft (§§ 664, 487) against Alpha Cleaners/Francisca D. (counts 32, 33). The jury found true for all counts the special allegation that these were hate crimes (§ 422.75, subd. (a)).

Morales was sentenced to 22 years to be served in state prison. Arias was sentenced to seven years eight months to be served in state prison. Restitution was awarded to the victims, which will be discussed further *post*.

### B. FACTUAL HISTORY

#### 1. *PEOPLE'S CASE-IN-CHIEF*

##### a. Eva L.—Xotic Image Hair Salon (Counts 1-4)

Eva L. owned Xotic Image, located on Sierra Avenue in Riverside. She rented chairs to hair stylists. Vanessa Z. was Eva's daughter and rented a chair in the salon. Veronica R. also worked at the salon as a hairstylist.

On April 24, 2016, around 6:00 p.m., defendants went in to Xotic Image. Morales had been a regular client for three years and Arias had also previously received a haircut at the salon. Vanessa had cut Morales's hair several times before that day; she had cut Arias's hair one prior time. On the prior occasions when defendants had come into the shop to receive haircuts, neither Morales nor Arias had complained about the price of their haircuts.

Veronica was working next to one of the stylists who cut Morales's hair. Veronica noted that Morales had been in for a haircut a few days prior to that day. The stylist asked Morales if he really needed a haircut as there was nothing to cut. The stylist gave the same type of haircut to Morales as Vanessa had given to Morales on prior

6

occasions. Arias got the same haircut she had previously received from Vanessa. Defendants paid for their haircuts and left the salon. They never complained about the price or asked why they paid different amounts.

On April 25, 2016, one of the stylists contacted Eva and told her that Eva had been served at the salon with legal paperwork. Eva went to the salon and picked up the paperwork, which was a "Complaint for Gender Discrimination and a Violation of Business and Professions Code 17200." It was filed on behalf of Arias. The lawsuit alleged that on April 24, 2016, Arias was charged $15 for a haircut and Morales was charged $8.

Eva was concerned she could not pay the damages, which were alleged to be around $40,000. Morales started calling Xotic Hair Salon the day after the lawsuit was filed but Eva did not return his calls. Morales told Veronica over the phone that the lawsuit was going to cost $10,000. She told him to stop calling because Eva had a lawyer. Vanessa answered one of the calls from Morales. He asked if the stylists were employees or independent contractors. Morales also mentioned $10,000. Vanessa described the different techniques she used on defendants to cut their hair; cutting Arias's hair was much more involved than cutting Morales's hair.

Eva met Rosa Sahagun; she went with Sahagun to a protest in front of Morales's law office that was held in July 2016. There were at least 50 people present. Eva attended because she wanted the community to be aware that Morales was filing these lawsuits. Morales came out in front of his office with a bullhorn. She did not listen to what he was saying.

7

### b. Omar T.—Irish Cleaners (Counts 5-8)

Omar T. was the owner of Irish Cleaners in Riverside. Omar and his family were Hispanic. On April 25, 2016, Omar was working with his mother around 11:30 a.m. when defendants came into the business. Morales had been a customer for several years. Arias dropped off a silk blouse and Morales dropped off a cotton shirt. Arias asked to be billed separately for the items and wanted to prepay for the items. She wanted to use a credit card for the blouse and cash for the shirt. Omar charged them $3.00 for the blouse and $2.50 for the cotton shirt. Morales directed Arias to make sure that she got a receipt, which Omar gave to them.

When defendants left the store, they both had little smiles on their faces. They made no mention of the difference in price for the shirts while in the store. Morales returned the next day and picked up the shirts; he said nothing about the price of the garments.

On April 27, 2016, Omar was served with a gender discrimination lawsuit on behalf of Arias with Morales as her attorney. It alleged she was charged more for her blouse. They were asking for $123,450 which include pain and suffering, lost wages and punitive damages. Omar was extremely upset and could not pay these damages. Omar hired an attorney who charged him $1,500.

Omar testified that the blouse had to be dry cleaned but the shirt was put in the laundry. The chemicals for the dry cleaning were more expensive than laundry soap. The cotton shirt took less time and could be pressed using a machine rather than hand

8

pressed like the blouse. A man's shirt if made of silk would be charged the same as he charged Arias.

Two days later, Morales called Omar. Morales told him he would settle out of court for $10,000. Omar laughed and told Morales he would see him in court. Omar felt that Morales was threatening him that he would have to pay a lot of fees if he went to court.

c.      Dae C.—Country Club Cleaners (Counts 9-12)

Dae C. had owned Country Club Cleaners in Riverside for 10 years. Dae was working on April 26, 2016, when Arias entered the business alone with two shirts: a woman's blouse and a man's shirt. Dae charged Arias $3.50 to clean the blouse and $2 to clean the shirt. The shirts did not appear to be dirty. He used a dry cleaning process on the blouse; it took an hour to clean and it was hand pressed. The shirt was put in the laundry and took only a few seconds to iron. A man came in the following day to pick up the shirts. He paid for the two items separately on the same credit card.

Dae was served with a gender discrimination lawsuit the following day. It was dated April 27, 2016. The lawsuit was filed by Morales on behalf of Arias for the differences in price on the shirts. It asked for $124,000 in damages. The lawsuit was a threat to his business. Dae could not afford an attorney.

About one week later, Dae received a telephone call from a male who identified himself as an attorney representing Arias in the gender discrimination lawsuit. He was told by the attorney that he could settle the lawsuit for $50,000 or lose the lawsuit and owe $100,000 to $150,000.

9

Nelida D. was a hair stylist and owned Latinas hair salon in Riverside. She had owned the salon since 2007 and there were seven stylists in the salon. Nelida was Hispanic and all of her stylists were Hispanic. On April 30, 2016, defendants came into the salon and received haircuts. Delia A. was a hairstylist at the salon. She cut both of their hair. Delia told Morales there was nothing to cut on his hair because it was so short. She offered to just clean it up on the side and she was going to charge him $10. He agreed. It took her 15 minutes.

Morales paid separately for his haircut with Arias's credit card. Delia told them they should just pay together but Morales wanted to pay separately even though they were using the same credit card. Arias then asked Delia to cut her hair. Arias just wanted a trim on the ends. Delia told her it would cost $15. It took Delia about 25 to 30 minutes to cut Arias's hair. Arias never asked why she was being charged $15 rather than $10. Arias paid with the same credit card and left without complaining about the price. The jury saw video of the haircuts.

On May 3, 2016, Nelida was served with a gender discrimination lawsuit filed by Morales for charging different prices for defendants' haircuts. She knew his name because she was aware he had been filing lawsuits against other hair salons. The lawsuit sought damages in the amount of $67,000. Nelida sought an attorney to help her.

Nelida and Delia received calls from Morales after the lawsuit was filed. Morales told them that Nelida had to pay him $10,000 cash within the week or he would proceed

with the lawsuit. Nelida told him she would go to court and he responded, "Okay. So then I'll see you in court, because that's what all businesses do."

Nelida participated in a demonstration in front of Morales's office in July 2016 with other salon owners and business owners who had been sued by Morales. Morales came out of his office with a speaker. He yelled, "Listen everybody. You all have the nopales on your forehead" and called the crowd "nopalitos." Nelida explained that this was a derogatory term for Mexican people similar to being called a "Wetback."

### e. Jose P.—Chic Hair Salon (Counts 17-20)

Jose P., who was Hispanic, had owned Chic Hair Studio in Riverside for 10 years. Jose did not cut hair but had two employees, including Ana N. On May 4, 2016, Ana gave haircuts to both defendants. Ana used clippers on Morales's hair. It took her 20 minutes and she charged him $8. She normally charged $11 but there was a special that day. She then cut Arias's hair. Arias asked her how much the haircut would cost and Ana told her $16. Ana used scissors to cut Arias's hair. It took her 30 minutes. Defendants paid separately.

On May 6, 2016, Jose was served with a gender discrimination lawsuit filed by Morales on behalf of Arias. The complaint alleged that on May 4, 2016, Arias had paid $16.50 for a haircut and a male patron had paid $8.50.[4] They were seeking $67,000 in damages. Jose could not pay the damages; he would lose his business. Jose contacted Morales who told Jose he filed the lawsuit because of different prices charged for haircuts

---

[4] Ana explained that the salon charged fifty cents to use a credit card.

for men and women. Jose explained that Morales would have to sue a lot of salons for charging different prices, and Morales responded, "Well, we will do that later. Right now we are dealing with your case." Morales told Jose he was willing to close the case if he paid $10,000. Jose declined and told Morales he was going to hire an attorney because he had not discriminated.

Jose participated in the demonstration outside Morales's office in July 2016. Morales used a bullhorn and yelled to the crowd that the lawsuits were based on the law. He also said that they had "nopal" on their forehead. It was a racist term for a Hispanic male; it was similar to calling a Hispanic person a "Beaner."

### f.　　Zafar R.—786 Beauty Incorporated (Counts 21-24)

Zafar R. owned the hair salon 786 Beauty Incorporated dba House of Beauty in Riverside (786 Beauty). Zafar did not cut hair but managed the facility. Zafar was from Pakistan. Zafar indicated that he did not set the amount that stylists charged for haircuts. He only set a pricing minimum of $10 and maximum of $25.

Lailama H. worked at 786 Beauty as a hairstylist in 2016. She was working on May 8, 2016. She did not recall whose hair she cut that day or how much she charged. Lailama charged for a haircut based on length and amount of work it required.

Zafar was served with a gender discrimination lawsuit on May 10, 2016. Morales filed the lawsuit on behalf of Arias for haircuts they received on May 8, 2016. They alleged that a male patron received a haircut for $10 but Arias paid $16 for a simple trim. The complaint alleged $67,000 in damages. The amount was a financial threat to his business.

12

g.    Susie N.—Susie's Hair Salon (Counts 25-27)

Susie N. owned Susie's Hair Salon located in Riverside.  She is Vietnamese.  On May 14, 2016, Susie was working at the salon.  Defendants came to the salon to get their hair cut.  Another stylist in the salon cut their hair.  Arias was charged $20 for her haircut and Morales was charged $12.  Neither Morales nor Arias complained about the haircuts or the price.  Arias paid for both haircuts.

Several days later, Susie received a gender discrimination lawsuit filed by Morales on behalf of Arias.  Susie was being sued for $41,000.  Susie could not afford to pay the damages.  She received a phone call several days after the lawsuit was filed from an attorney but she hung up because she was afraid.  Susie believed she would lose her business.

h.    Harshayu P.—Crown Cleaners (Counts 28-30)

Harshayu P. had owned Crown Cleaners located in Riverside for 31 years.  On May 18, 2016, Morales filed a gender discrimination lawsuit on behalf of Arias against Harshayu and Crown Cleaners.  The complaint alleged that on May 18, 2016, Arias paid $4.50 to dry clean her blouse and other male patrons paid only $2.50 for a similar service.  Harshayu recalled that Arias came to the cleaners alone with two shirts.  Harshayu explained to Arias when she dropped off the two garments that it cost more to dry clean the blouse than the man's shirt.  Arias dropped off the two shirts.  Harshayu gave her the invoice for the cleaning and she did not complain about the price.  Arias picked up and paid for the shirts.

The lawsuit sought $67,000 in damages. Harshayu would have to close his business if he had to pay the damages. Harshayu hired an attorney. Morales offered to settle the case for $5,000 but he could not pay that amount. Harshayu explained that it cost more to dry clean a shirt than to launder a shirt. The dry cleaning process required special chemicals and a special machine.

i.      Francisca D.—Alpha Cleaners (Counts 31-33)

Francisca D. owned Alpha Cleaners in Riverside. She was Hispanic. On May 25, 2016, Morales entered Alpha Cleaners with a woman's cotton blouse. Francisca gave Morales a receipt charging $3.75 for the blouse. Morales asked how much she would charge for a man's shirt and Francisca told him $3.50. Morales walked out of the store and returned with a man's shirt that he dropped off for cleaning. Francisca added the man's shirt to the receipt she had previously given Morales and charged at total of $7.25.

Morales filed a lawsuit on behalf of Arias for gender discrimination on May 27, 2016. The complaint alleged $109,000 in damages; Francisca could not believe the amount based on a 25-cent difference in price. Francisca was very upset and could not eat or sleep. She believed she would lose her business. Francisca explained the women's shirt had to be pressed differently because of seams on the blouse that were not on the man's shirt. It required hand pressing.

Francisca spoke with other business owners who were also sued by Morales. She participated in the demonstration outside Morales's office in July 2016. Morales came out of his office and spoke to the crowd with a speaker. Morales told them he was going to send them all back to Mexico "because he had the power." He also used the phrase "

14

'Nopales in la frente' " which was a derogatory term like "wetbacks." Francisca acknowledged that Rosa Sahagun was involved in the protest and advised them so they would not get arrested.

> j.　　　Maricela L.—Marcella's Barbershop (Counts 35-37)

Maricela L. was a hair stylist and had owned Marcella's Barbershop in Riverside for 17 years. On May 29, 2016, defendants came into the shop for haircuts. Both of them had their hair cut and paid without complaining about the price. Arias did ask at the end of her haircut why she was being charged more. Maricela told her it was because it was a different process to cut her hair. Arias seemed upset and asked for a receipt.

On June 5, 2016, defendants returned to the salon and they both got their hair cut. The jury was shown a video of the haircuts. Arias was given a trim but she did not need it. Morales also did not need a haircut. They paid cash.

In June 2016, Maricela was served with a gender discrimination lawsuit. It was filed on June 9, 2016, by Morales on behalf of Arias. It alleged that on May 29, 2016, Arias received a haircut and paid $14 and a male patron paid $10 for a similar service. Arias was seeking $67,000 in damages. Maricela feared she would have to close her business if she had to pay the damages. Maricela explained that cuts with clippers were $11 and cuts with scissors were $13. The difference in price was based on the labor involved.

Maricela received a phone call from Morales after the lawsuit was filed. He told her that she could pay $7,000 to settle the case and not have to go to court.

15

### k. Rosie Q.—Your Hair Center (Counts 38-41 & 48)

Rosie Q. owned Your Hair Center in Riverside. On June 26, 2016, defendants came into the salon for haircuts. Rosie and the other stylist in the salon were Hispanic. Rosie recalled that they had been in the salon before. On June 26, she cut Arias's hair and the other stylist, Dora, cut Morales's hair. Rosie told Arias she really did not need a haircut but Arias insisted. Dora told Morales that the clippers were not cutting anything.

Arias was charged $20 and Morales was charged $15. Arias used the same debit card for both haircuts but asked that they be charged separately. Approximately one week later, Rosie was served with a lawsuit filed by Morales on behalf of Arias for gender discrimination. It was filed on July 7, 2016. The complaint alleged $80,000 in damages. That same day, she called Morales to ask about the lawsuit. Morales told her they could settle out of court if she paid him $10,000. He told her it would cost her more to fight the lawsuit. Rosie told him she was going to fight the lawsuit. Rosie charged them different prices because Morales only needed the clippers and scissors were required for Arias.

Morales also told Rosie that he had pictures of her, which would result in her being convicted in a criminal case. Rosie called the police and they told her it sounded like extortion.

### l. Janet M.—Visage Hair Salon (Counts 42-44)

Janet M. owned Visage Hair Salon in Los Angeles. Janet was Persian; she had two Hispanic women who helped her run the shop and perform haircuts. On January 17, 2017, Janet was served with a gender discrimination lawsuit that Morales filed against

16

Visage on behalf of Arias. It alleged that on October 5, 2016, Arias entered her business and was charged $40.[5] Janet could not find Arias in the appointment book and video from the salon for that day did not show that Arias came into the salon. The lawsuit sought $25,000 in damages. The damages were a threat to her business.

Janet spoke with Morales about the lawsuit. Janet told him that Arias had never been in the salon. He laughed and told her, "You can deny as much as you want. I have the photos." Morales told her that they could settle the case "[d]own the road." Janet explained that she based her pricing for haircuts on the service and the time involved.

Riverside Police Detective Dave Smith investigated the allegation against Visage Hair/Janet M. He discovered that Morales had been in court in Los Angeles on October 5, 2016, near the salon. Arias's cellular telephone showed that she was in Riverside on October 5.

m.      Rosa Elena Sahagun (Count 45, 51-63)

Rosa Sahagun was an attorney who specialized in family law, immigration and criminal defense. She was Hispanic and involved herself in community activism especially helping the Hispanic community. One of Sahagun's friends told her defendants had been suing small businesses; she met with some of the business owners who had been sued. She also spoke with other business owners who were concerned they would be targeted. She had a meeting with several community members and invited

---

[5] The complaint referenced dry cleaning.

17

another attorney, Bryan Owens, to attend the meeting. Owens agreed to represent many of the business owners on a pro bono basis.

Sahagun and the community members organized a protest at Morales's office on July 17, 2016. There were 30 to 40 community members present. Morales came out of his office and started yelling into a bullhorn. She heard Morales make a comment about having cactus on foreheads, which was very derogatory.

After the protest, there were posts on the Facebook page for her law office from an account belonging to Morales. The posts were about the protest and he posted, "We can hear your voice, bitch lawyer." There were approximately 60 posts from Morales on her page. He accused her of being a fraud. Morales also posted on her page audio of the meeting she had with community members before the protest. He posted multiple times "Mexicans speak Spanish." He posted numerous times, "Play the entire recording." Morales also posted a photograph of Sahagun on his own Facebook page calling her corrupt and a fraud, and that Sahagun was obsessed with him and in love with him.

Morales sent Sahagun a private message on her personal Facebook page that she seemed obsessed with him. Sahagun became concerned. She installed security cameras in her office. She stopped being at the office alone. She no longer felt safe.

Sahagun started receiving threatening messages on her Facebook page posted by Cali Rave Cartel. The posts included claims that she was a fraud and a whore. One of the posts called her a "cunt" and a "fucker." Another post from the Cali Rave Cartel called her a "fucking whore attorney" and that they were coming to her office to get justice.

18

Sahagun searched Morales's Facebook page and saw posts using the Cali Rave Cartel logo on clothing. There was a photograph of Arias wearing a shirt with the Cali Rave Cartel logo on it on a website for Cali Rave Cartel. Sahagun hired a private investigator and confirmed that the posts came from Morales. Based on the information, she filed a restraining order against him on July 27, 2016. This gave her emergency protection from Morales. The restraining order was granted on August 30, 2016. Morales was ordered not to contact Sahagun in any way either himself or through third parties. He was not to harass her. They were both awarded attorney fees because the stay away order was denied.

After the fees were awarded, Sahagun started received messages on her Facebook page from someone named Mustafolo Elizabaragan. The profile picture was a female but Sahagun did not know the female. She believed they were from Morales so she kept a record. There were approximately 40 to 50 posts all asking when she was going to pay the money for the attorney fees to Morales. Another post stated, "I heard the federal system will go bad or be bad for you." There were 30 posts on November 3, 2016. Others were sent on November 5, 2016. One of the posts stated that she would lose her bar license if she disobeyed the order to pay Morales. Sahagun contacted the police because she believed these posts were from Morales in violation of the restraining order.

Detective Smith investigated the claim by Sahagun that Morales had violated the restraining order. Smith obtained search warrants for the Facebook pages for Elizabaragan Mustafolo and Cali Rave Cartel. Smith discovered that the IP addresses, which showed where the messages were sent from a device, were the same for Mustafolo

19

and Cali Rave Cartel. This IP address was also matched to Morales's law firm. Further, the phone number associated with Cali Rave Cartel belonged to Morales.

n.  Extortion Counts Due To Email Sent From Morales To Bryan Owens (Counts 45-50)

Bryan Owens was an attorney.[6] Owens became involved in the gender discrimination lawsuits when he was approached by Eva from Xotic Image Hair Salon. He represented Xotic Image Hair Salon, Latinas Hair Salon, Alpha Cleaners, Country Club Cleaners, Irish Cleaners, Chic Hair Salon, 786 Beauty, Susie's Hair Salon, Crown Cleaners, Marcella's Barbershop, Your Hair Center and Visage. He agreed to represent them pro bono. Owens reviewed all of the cases. The complaints all were very similar and appeared to be a form complaint used for the lawsuits.

Morales filed a civil harassment restraining order against Sahagun, Owens, members of the press, and some of the business owners on behalf of Arias. Owens represented all of the named business owners. The business owners included Nelida (Latinas Hair Salon) and Rosie (Your Hair Center). The other persons included Alejandro C., who worked for a Spanish newspaper, and Luis Z., who was Nelida's boyfriend. The request for a civil harassment restraining order was denied. The trial court awarded attorney fees that would be granted if Owens filed a motion detailing the fees. Attorney fees were awarded in the amount of $12,000 in March 2017.

---

[6] Bryan Owens was married to Sahagun on February 14, 2018.

Morales sent an email to Owens on November 3, 2016, threatening to file a federal lawsuit against Sahagun and the others if they tried to collect the attorney fees. The email stated, "Against my strenuous objection, my client intends to file a federal [lawsuit] only if anyone files a motion for attorney fees and costs as a result of the restraining order cases from yesterday. My sincerest hope is that someone, anyone, files a motion for attorney's fees. I deeply yearn for federal civil litigation experience. I wonder if the federal courts will draw an adverse inference from the invocation of the Fifth Amendment right against self-incrimination." Sahagun and Owens took this as a threat that if they tried to collect attorney fees Morales would seek federal criminal charges against them. Owens relayed Morales's message to his clients (Nelida, Rosie, Alejandro, and Luis) and Sahagun.

o.      Investigation

When Sahagun told Detective Smith about the salon and dry cleaner business owners being sued by defendants, he pursued an investigation into the lawsuits. Smith noted that all of the businesses were in Riverside between Morales's office, and the home defendants shared.

Ednna A. met Morales in college in 2002. They remained friends after college. In March or May 2016, Morales contacted Ednna and told her he had a business proposition for her. Ednna was a stay-at-home mom and wanted to make some extra money. She met him at a restaurant in Upland. He was with Arias.

Morales told her the plan was to go to "mom-and-pop" hair salons and dry cleaners. Ednna would go with him to the shops to get haircuts. They would both pay

21

for the haircuts and get separate receipts.  They would then determine if the business charged her more for a haircut.  The hope was that she would be charged more and then he would file a lawsuit the next day claiming gender discrimination.  She understood they would make money from the lawsuits.  Arias was present during the entire conversation.

Morales told her that he was going to target immigrants because they had no money to "lawyer up."  Ednna asked him why he did not want to go after big chains and he responded, " 'They have money.  We could, but they have money to lawyer up.' "  He also tapped his chest and said, " 'my people are stupid.' "

Morales also said to Ednna, " 'They come here with their hard earned money to open up a business, and we go there and we just take it away, the money, and that's it.' "  Morales also planned to target dry cleaners which he said were owned by " 'The Chinitos.' "  Ednna explained this was a slang term for any Asian person.

Morales told Ednna that they would take all of the business owners' savings.  He also mentioned that if the victims had children with special needs they would no longer be able to care for them because he was going to take all of their savings.  Arias worked with special needs children.  Ednna asked Arias if she felt bad because the victims may have special needs children.  She responded, " 'Yes, I know.  I do feel bad, but that's why I have him serve the papers the day after we get our haircuts.' "  Morales looked at Arias and asked her, " 'You do want to go to Spain this year, don't you?' "  She responded, " 'Yes.' "  He then asked her, " 'You do want to have a big wedding the following year, don't you?' "  She said " 'Yes.' "  Morales stated, " 'Then you'll do it.' "

Morales told Ednna that the plan was not for the "faint of heart." Ednna asked how Morales could do this since he was an immigration lawyer. He responded, "Well, the way I see it, I'm already an immigrant lawyer. I'm already doing good over here, and this, it just balances out." Morales told her he intended to settle with the victims for $5,000 or $6,000. If they did not want to settle and the cases went to court they would lose because they could not afford an attorney. He expected they could win $60,000 if they won the lawsuits. He hoped for quick settlements and would split the money with Ednna. Ednna refused to help him.

Morales never told Ednna that the lawsuits would be unlawful or fraudulent. Morales never told her what they were doing was illegal. Ednna found out about the lawsuits that had been filed and called the police in 2017. Ednna was not present during any of the transactions that occurred at the businesses so she had no idea if gender discrimination had occurred.

### 2. DEFENSE

Morales represented himself at trial and testified on his own behalf. He had been an immigration attorney since 2010. He primarily practiced in Riverside. Morales created the website for Cali Rave Cartel, a clothing company. The messages sent from the Cali Rave Cartel to Sahagun were sent by ex-employees of his. He never stalked Sahagun by going to her house or office. His statements on her Facebook page were legitimate statements. He denied that "Nopales" was a derogatory term. Morales testified that threatening to sue someone in federal court was a right, it was not extortion. He also was entitled to file the gender discrimination lawsuits. Morales insisted that the

23

businesses all told him and Arias that they charged more to women. Morales claimed the incorrect date on the complaint against Janet/Visage Salon was typographical error and the correct date was November 5, 2016. The lawsuits were not illegal.

Morales had a good faith belief he was entitled to file the lawsuits. He and Arias had no idea when they got the haircuts that they would be charged different prices. He only filed lawsuits if they admitted to charging women more. None of the lawsuits that had been filed had been dismissed; they were all still pending. Morales filed the lawsuits to "eradicate gender discrimination." Morales acknowledged it would not be discrimination if cutting a woman's hair required different skill or more effort. The lawsuits were still pending and he was still an active attorney.

## DISCUSSION

A.     EXTORTION AND ATTEMPTED EXTORTION CONVICTIONS

       (COUNTS 2-3, 6-7, 10-11, 14-15, 18-19, 22-23, 26, 29, 32, 36, 39)

Defendants make several arguments that their convictions for attempted extortion and extortion should be reversed. This analysis applies to only those counts based on the filing of the gender discrimination lawsuits, which consist of the section 523 extortion counts against both Arias and Morales, and the convictions against Morales pursuant to section 524 based on Morales calling the businesses offering to settle.[7] Morales claims

_____

[7] In a separate section we will address the extortion convictions (counts 45-50) that were based on Morales's email threatening to file a federal lawsuit. Further, we will separately address count 40, the extortion count for advising Rosie she could face criminal charges; and count 42, the extortion count against Janet where the evidence showed that Arias was not at Visage Hair Salon on the date that Morales claimed Arias received a haircut.

on appeal that (1) the trial court erred by denying his section 1118.1 motion and there was insufficient evidence presented to support his convictions of extortion for filing discrimination lawsuits and seeking to settle the lawsuits because the prosecution did not present evidence that the lawsuits were unlawful; (2) the trial court erred in submitting the legal question of probable cause to file the gender discrimination lawsuits to the jury; and (3) the extortion convictions based on filing discrimination lawsuits are unconstitutional and must be reversed because the extortion counts were presented to the jury on an invalid legal theory. Arias contends (1) insufficient evidence was presented to support that she aided and abetted Morales in the extortion crimes because she did not have knowledge that the lawsuits filed by Morales were unlawful; (2) the trial court erroneously failed to instruct the jury on the affirmative defense of litigation privilege for the extortion counts; and (3) the trial court's instructions on gender discrimination were misleading and prejudicial. Arias further contends, joined by Morales, the lawsuits could not form the extortion claim because they had to terminate in favor of the businesses in order to be unlawful.

1.   *ADDITIONAL FACTS*

At the completion of the People's evidence, defendants both brought section 1118.1 motions to dismiss based on the argument that filing of a gender discrimination lawsuit did not constitute extortion. They sought dismissal of counts 1 through 41. The People contended "The Complaint and summons and statement of damages are the writings upon which the extortion claims are based." The People argued that filing a lawsuit that was not a "righteous lawsuit" was unlawful. The trial court wanted to know

25

what evidence was presented to support that the lawsuits were unlawful. The prosecutor argued that defendants entered the businesses with a scheme in mind. Their demeanor and behavior was fraudulent. Further, the victims testified that the allegations were not true.

The prosecutor argued that it was up to the jury to determine if the behavior was unlawful, which was shown by the evidence that all of the lawsuits were part of a scam. Unlawfulness was an element of the crime to be determined by the jury.

The trial court asked if there was an expert who could testify that what defendants did by getting haircuts and being charged differently was not gender discrimination. The prosecutor responded this was not an expert determination but was a jury question. The prosecutor believed the jury would need to be instructed on gender discrimination law. The trial court again asked if any expert was going to come in and testify this was not gender discrimination. The prosecutor insisted that this was a jury determination.

After this discussion, the People filed a brief opposing the section 1118.1 motion brought by defendants. The People argued the unlawful injury was the threats to recover upwards of $100,000 for lawsuits where there was no cause of action. There was sufficient evidence for the jury to determine that defendants knew there was no cause of action because they were aware of the varying time, skill and cost of different haircuts, and the reasons why they paid a different price for dry cleaning. The false statement was the patently false statement that the differences in price were based on gender discrimination and not because of any difference in the service.

26

The matter was heard on November 27, 2018. The trial court noted this was not an ordinary case, that the People were proceeding on a novel theory, and there was very little case law on point. The trial court referred to cases involving obstructing or delaying a police officer, which required that the police officer be acting lawfully, which was left to the jury to decide. The trial court reviewed Civil Code section 51.6: subdivision (b) involved the law against gender discrimination, and subdivision (c) detailed that a price difference could be based on amount of time or difficulty in providing the services. The trial court intended to instruct the jury with both subdivisions so it could determine whether the filing of the lawsuits was unlawful. The trial court would also instruct the jury on extortion. The trial court intended to deny the Penal Code section 1118.1 motion to dismiss because of the witness testimony and the special jury instruction.

Morales objected that he did not have the opportunity to properly cross-examine the witnesses as to the issues of price and skill. Morales argued that an expert had to testify that these lawsuits were unlawful.

Arias's counsel also argued due process because there was no way of knowing that skill, etc., were going to be issues at trial. The trial court denied the section 1118.1 motions on the extortion counts.

The trial court instructed the jury on gender discrimination law as follows: "No business establishment of any kind whatsoever may discriminate with respect to the price charged for services of similar or like kind against a person because of the person's gender. Nothing in subdivision (b) prohibits price differences based specifically upon the amount of time, difficulty, or cost of providing services."

27

The trial court then instructed the jury on the crime of extortion by letter pursuant to section 523 for the counts against defendants. The jury was instructed as to counts 6, 10, 14, 18, 22, 26, 29, 32, 36, and 39: "To prove the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant sent or delivered a threatening letter or other writing to another person; [¶] 2. In the letter or writing, the defendant threatened to unlawfully . . . injure the other person or the property of the other person; and [¶] When sending or delivering the letter or writing, the defendant intended to use fear to obtain money with the other person's consent. [¶] The term 'consent' has a special meaning here. Consent for extortion can be coerced or unwilling as long as it's given as a result of the wrongful use of force or fear. [¶] The threat can be directly stated in the letter or writing, or can be implied by the contents of the letter or writing and the surrounding circumstances, or can be intended by the sender to be understood as a threat by the recipient. [¶] Threatening to do something that a person has a legal right to do is not a threat to commit an unlawful injury."

The jury was instructed as to the section 524 attempted extortion counts against Morales (counts 3, 7, 11, 15, 19, 23, and 40) that the jury had to find "1. The defendant threatened to unlawfully injure another person or the property of another person; [¶] 2. When making the threat, the defendant intended to use that fear to obtain the other person's consent to give the defendant money; and [¶] 3. As a result of the threat, the other person consented to give the defendant money; and [¶] 4. As a result of the threat, the other person then gave the defendant money." The jury was again instructed on the meaning of consent.

28

The jury was further instructed, "A defendant is not guilty of burglary, extortion by threatening letter, attempted extortion, and attempted grand theft if he or she made an honest or good faith mistake about the law, if that mistake show[s] that he or she did not have the specific intent required for the crimes of burglary, extortion by threatening letter, attempted extortion, and attempted grand theft."

In closing argument, the prosecutor advised the jurors that the threats to commit unlawful injury were the lawsuits filed by Morales on behalf of Arias. They were not "righteous lawsuits" so they were threatening. The jury had to decide if the gender discrimination lawsuits were lawful. Morales set up all the lawsuits because they were all in the same area and they targeted minorities. The prosecutor argued the meeting with Ednna showed Arias knew the lawsuits were illegal.

In response, Arias's counsel argued lawyers were entitled to file lawsuits that made them money. Further, it was impossible for Arias to know if the lawsuits were fraudulent. Morales, who represented himself at trial, stated there was no evidence presented at any time that the filing of the lawsuits were unlawful. The lawsuits were still pending.

2. *ANALYSIS*

There is no case law or precedent that provides filing of a civil lawsuit can constitute an unlawful injury to person or property under the extortion law. The People chose to file the charges of extortion and attempted extortion aware there was no prior legal support for such a novel theory that the filing of the civil lawsuits were unlawful as defined in the extortion statutes.

29

"In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212.) "In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court applies the same standard an appellate court applies in reviewing the sufficiency of the evidence to support a conviction, that is, ' "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' " (*Id.* at pp. 1212-1213.)

Section 518 defines extortion as "the obtaining of property . . . from another, with his or her consent, . . . induced by a wrongful use of force or fear, or under color of official right." Section 523 proscribes sending a threatening letter with intent to extort. It reads, "Every person who, with intent to extort property or other consideration from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519." (§ 523.) Section 519, provides in pertinent part, "Fear, such as will constitute extortion, may be induced by a threat . . . [¶] 1. To do an *unlawful injury* to the person or property of the individual threatened or of a third person." (Italics added.)

"Attempted extortion is defined in section 524 as an attempt, 'by means of any threat, such as is specified in Section 519 of this code, to extort money or other property from another.' The elements of attempted extortion are '(1) a specific intent to commit extortion and (2) a direct ineffectual act done towards its commission." (*People v. Umana* (2006) 138 Cal.App.4th 625, 638-639.)

The question the jury had to decide as to both the attempted extortion and extortion by letter was whether the gender discrimination lawsuits filed by Morales on behalf of Arias were unlawful. However, there is no case law that defines how "unlawful" should be determined when it is based on the filing of a civil lawsuit. As such, no instruction to the jury was given as to what was meant by "unlawful" other than threatening to do something that a person has a legal right to, is not a threat to commit an unlawful injury.

The lawsuits filed by defendants were pursuant to the Gender Act and, as such, it is necessary to resolve what is required to file a gender discrimination lawsuit under the Gender Act. The Gender Act provides that "No business establishment of any kind whatsoever may discriminate, with respect to the price charged for services of similar or like kind, against a person because of the person's gender." (Civ. Code, § 51.6, subd. (b).) Civil Code section 51.6, subdivision (c), further provides, "Nothing in subdivision (b) prohibits price differences based specifically upon the amount of time, difficulty, or cost of providing the services." "The [Gender] Act stands as a bulwark protecting each person's inherent right to 'full and equal' access to 'all business establishments.' "

31

(*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167.) "[T]he [Gender] Act must be construed liberally in order to carry out its purpose." (*Ibid.*)

Civil Code section 52, subdivision (a), provides that "[w]hoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6."

There is very little case law on civil cases brought to enforce the Gender Act. However, based on the language, the exceptions in Civil Code section 51.6, subdivision (c), would necessarily have to be proven by the defendant as a defense to the action and are not relevant as to whether the gender discrimination lawsuit is properly filed. It would place an unfair burden on plaintiffs to have to prove the price differential was based on the time and skill before bringing a lawsuit pursuant to the Gender Act.

This is supported by other types of discrimination lawsuits, which have put the burden on the defendant to establish a nondiscriminatory reason for the disparity. In a case involving a sex discrimination lawsuit pursuant to Government Code section 12940, the court set forth the burden of proof. It stated, "First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's

32

rejection." [Citation.] Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but a pretext for discrimination." (*University of Southern California v. Superior Court* (1990) 222 Cal.App.3d 1028, 1035.) As such, it appears that a lawsuit brought pursuant to the Gender Act does not require that the plaintiff prove a negative; that the price differential was not based on gender but rather the time and skill involved. Rather, such determination goes to the merits of the lawsuit.

As stated, in the trial court, the prosecution proceeded on the theory that the extortion and attempted extortion were based on the *unlawful* lawsuits filed by Morales on behalf of Arias. The prosecutor argued the lawsuits filed by Morales were not "righteous lawsuits" so they were unlawful. The prosecutor advised the jurors that they had to decide if the lawsuit was lawful, relying solely on the evidence that the business owners had testified that the differences in price for the haircuts and dry cleaning were based on differences in time and skill. However, this was not proper evidence to support that the lawsuits, when filed by defendants, were unlawful. The only evidence presented and relied upon to support that the civil lawsuits were unlawful was the testimony by the business owners: that the reasons for the difference in price were the time and skill. However, this went to the merits of the lawsuit, not whether the lawsuit was appropriately filed. There was no other evidence that the filings of the gender discrimination lawsuits were improper.

33

On appeal, the People fail to provide any standard for determining whether the gender discrimination lawsuits were unlawful, or any other evidence to support they were unlawful. The People note that the jury could find the lawsuits "baseless" because of the exceptions in Civil Code section 51.6, subdivision (c), which we have rejected as a proper determination of whether a gender discrimination lawsuit can be properly filed under the Gender Act. The People also note that they were filed in "bad faith." However, this does not address whether the lawsuits themselves were unlawful.

The People rely upon *In re Nichols* (1927) 82 Cal.App. 73 (*Nichols*) in an attempt to show that the gender discrimination lawsuits were unlawful. In *Nichols*, the court addressed whether the defendant—who was convicted of conspiracy to commit extortion and conspiracy to falsely move and maintain a suit, action, and proceeding within the meaning of section 182—could be sentenced to probation and state prison on the two counts. In that case the defendant and an unmarried couple set up a man by luring him to a hotel room with the woman. They then threatened to sue the man for alienation of affections for being with a married woman. (*Nichols*, at p. 75.) The *Nichols* court addressed what constituted an unlawful injury within the meaning of the extortion statutes. The court first referred to an earlier case which stated, " 'The word "unlawful," as used in this statute, qualifies the word "injury", alone. If the injury threatened to the property is one which the person threatening has an absolute legal right to do, he cannot be held to have threatened "to do an unlawful injury" to the property; even though his motive in making the threat is to obtain from the person threatened money to which he is not entitled, and, consequently, it cannot be held to be an injury within the provisions of

sections 519 and 520 of the Penal Code. . . . [¶] 'What is meant by the term "unlawful injury"? Giving to such term the broadest meaning possible under the authorities, it can include no injury that is not of such a character that, if it had been committed as threatened, it would have constituted an actionable wrong, an injury for which an action for the resultant damages could be maintained against the defendant, or which, if merely threatened, could be enjoined in equity if the remedy at law were deemed inadequate." (*Id*. at pp. 76-77.)

The *Nichols* court found that the threat to sue was unlawful because the suit was baseless. "It may therefore be taken as established law that, considering the first count of the information herein, one of the essential allegations was that an unlawful injury was threatened as to the property of the intended victim. The only unlawful injury which, solely from the context of such count, could possibly result to the intended victim was that a civil action would be brought against him for alienating the affections of Hilda E. Daws, not from her husband, because she had none, but from her co-conspirator Carl H. Marks. If it be possible (which point is unnecessary of decision here) that said first count stated the commission of a criminal offense, it does so only by considering that it contains a sufficient averment of fact that Hilda E. Daws was not a married woman, and, therefore, that by reason of the threatened civil action for the alienation of the affections of Hilda E. Daws an unlawful injury was threatened as against the intended victim. So considered, in substance the first count of the information would be identical with the second count thereof." (*Nichols*, *supra*, 82 Cal.App. at pp. 76-78; see also *Sosa v.*

35

*DIRECTV, Inc.* (9th Cir. 2006) 437 F.3d 923, 940 ["extortion predicated on threat to sue requires allegation that threatened suit was objectively baseless" referencing *Nichols*].)

The People insist that the instant case fits within the four corners of *Nichols*. The People claim that the haircuts received and the cleaning services had to be processed differently, showing that the lawsuits were baseless. However, as stated, the fact that the businesses may have had a defense to the gender discrimination lawsuits does not mean they were "baseless" or "unlawful" as that term was used in *Nichols*. The prosecution relied upon the fact that the differences in price were based on the skill involved in the haircuts and dry cleaning, and presented only evidence that the lawsuits were unlawful by arguing that they were meritless. But this does not mean the lawsuits were unlawful when filed. There is no dispute that Arias was charged a different price for a similar service.

On appeal, Morales contends that the proper determination of whether the lawsuits were unlawful is the standard applied to the civil tort of malicious prosecution, which requires that the lawsuits be filed without probable cause and with malice. Arias contends the proper standard for determining whether the lawsuits were unlawful is whether there was probable cause and were filed in good faith relying on Rules of Professional Conduct, rule 3-3.1 (a)(1) and (a)(2). Arias also notes, joined by Morales, that the malicious prosecution standard required the action be terminated against them on the merits.

Rules of Professional Conduct, rule 3.1 provides that a lawyer cannot "(1) bring or continue an action, conduct a defense, assert a position in litigation, or take an appeal,

36

without probable cause and for the purpose of harassing or maliciously injuring any person; or [¶] (2) present a claim or defense in litigation that is not warranted under existing law, unless it can be supported by a good faith argument for an extension, modification, or reversal of the existing law."

The People dispute the malicious prosecution standard applies because case law does not support that in order to be guilty of extortion for filing a civil lawsuit, the civil lawsuit must be terminated against the party bringing the civil lawsuit. "One of the essential elements of an action for malicious prosecution [citation] is that the prior litigation have resulted in a ' "favorable termination" ' as far as the plaintiff is concerned. The basis for the requirement is that it ' "tends to indicate the innocence of the accused." ' " (*Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 26.) However, the People do posit that it may be appropriate to define unlawful injury for filing a civil lawsuit on the first two elements of the civil tort of malicious prosecution: probable cause and malice.

We also note that CALJIC No. 14.72 included a definition of unlawful injury but was not given to the jury in this case. It provides "The words 'unlawful injury' mean an injury which, if inflicted, would create civil liability against the person doing it and would support a civil action against [him or her]. A threat to do that which one has a legal right to do is not a threat to do an unlawful injury." "CALJIC No. 14.72 defines 'unlawful injury' as used in section 519, subdivision *1*. It encompasses a physical injury to a person's property. CALJIC No. 14.72 says such injury may be threatened if the

person has a legal right to inflict it." (*People v. Umana*, *supra*, 138 Cal.App.4th at p. 642.)

However, it is not necessary to establish a definition of "unlawful" in order to resolve whether there was sufficient evidence to support that the gender discrimination lawsuits were unlawful in this case. Under any theory—probable cause and malice as defined for a malicious prosecution case, "righteous lawsuits" as argued by the prosecutor below, "unlawful" as that term is defined in *Nichols* or without probable cause as set forth in Rules of Professional Conduct rule 3.1—because all of these require at least some determination the lawsuit was brought based on probable cause. Under that standard, the prosecution relied on improper evidence to prove the lawsuits were unlawful or without probable cause. Evidence that a lawsuit will fail on the merits does not make it unlawful. The jury was given no proper evidence from which it could determine, without reliance on the exceptions in Civil Code section 516, subdivision (c), that the lawsuits themselves when filed were unlawful.

As such, insufficient evidence was presented by the People that the lawsuits filed by defendants were unlawful. The only evidence that was properly considered by the jury regarding whether the lawsuits were unlawful was that Arias was charged a different price for a haircut and dry cleaning than Morales. Further, it should be noted that the lawsuits were still pending at the time of the trial. While defendants could have surmised the difference in price was due to the difference in the length of hair or the time involved, it would not serve the purpose of the Gender Act to place the burden on them to prove that the difference of price was due to time and skill prior to filing a claim of gender

38

discrimination under the Gender Act. While certainly these lawsuits may eventually be found to lack merit, based on Civil Code section 51.6, subdivision (c), that does not make the lawsuits "unlawful" when filed. There simply was no evidence presented by the prosecution that these lawsuits, under any definition, when filed, were unlawful.

The People also contend that the jurors could have concluded that defendants "knew" the lawsuits were baseless based on defendants' discussions with Ednna. While defendants discussed targeting places that were owned by minorities, and that they would obtain haircuts and dry cleaning services hoping for a disparity in price, this did not conclusively mean that they knew the lawsuits were baseless or unlawful. In fact, the opposite seems to be true. They believed that they could proceed to the merits of the claims, by targeting minorities who would not hire attorneys to fight the claims. While defendants may have an abhorrent motivation for bringing the gender discrimination lawsuits, no evidence supports that they believed them to be false or unmeritorious.

We need not resolve the additional issues raised by defendants in support of their claim that their convictions for extortion and attempted extortion should be reversed. Simply, there was no proper evidence presented upon which the jury could determine that the gender discrimination lawsuits were unlawful when filed. Defendants filed the lawsuits based on them each being charged a different amount for haircuts and dry cleaning. These lawsuits were still being pursued in civil court and had not been immediately dismissed. At the time that defendants filed the lawsuits, the evidence presented was that they were charged differently for similar services. Insufficient

39

evidence was presented by the prosecution to prove that the complaints filed were unlawful.

It follows that Morales's settlement demands in connection with the filing of the lawsuits were not supported by evidence. There is no dispute an attorney, after filing a lawsuit, is entitled to seek a settlement. The prosecutor argued to the jury, "So Mr. Morales in this case, and what this is based on is all those phone calls he made after the lawsuits were filed. So Mr. Morales got on the telephone with all of these businesses and told them, 'It's going to get worse. We're going to go to trial. Give me $10,000 and it will go away.' That's extortion in this case. In a typical lawsuit, again, it's not. They can settle like that." As such, the convictions pursuant to section 524 are not supported by the evidence.

Based on the foregoing, insufficient evidence was presented that the complaints filed in the gender discrimination lawsuits threatened unlawful injury as required by the extortion statutes and therefore we reverse counts 2, 3, 6, 7, 10, 11, 14, 15, 18, 19, 22, 23, 26, 29, 32, 36, 39, and 41.

B. EXTORTION FOR THREATENING A FEDERAL LAWSUIT IF THE VICTIMS TRIED TO COLLECT ATTORNEY FEES—COUNTS 45 THROUGH 50

Morales contends his convictions in counts 45 through 50 must be reversed because his email to Owens advising him that Arias would want to file a federal action if the victims tried to collect the attorney fees awarded to them for defending the restraining order did not constitute extortion because it did not constitute an unlawful act.

40

As stated, Morales filed civil harassment restraining orders against Sahagun, Owens, Luis, Alejandro, Nelida, and Rosie on behalf of Arias, which were denied. On November 2, 2016, the trial court awarded attorney fees that would be granted if Owens filed a motion detailing the fees. Morales then sent the email to Owens on November 3, 2016, stating "Against my strenuous objection, my client intends to file a federal [lawsuit] only if anyone files a motion for attorney fees and costs as a result of the restraining order cases from yesterday. My sincerest hope is that someone, anyone, files a motion for attorney's fees. I deeply yearn for federal civil litigation experience. I wonder if the federal courts will draw an adverse inference from the invocation of the Fifth Amendment right against self-incrimination."

As he did for the gender discrimination lawsuits, defendant contends the prosecution failed to present evidence that he threatened to do unlawful injury as required by section 523. There was no evidence that his filing of a federal lawsuit lacked probable cause or would be filed with malice. We previously set forth the standard of review for insufficient evidence, the elements of section 523 and the instructions given to the jury.

The People contend defendant "articulated absolutely no basis" for his threatened federal lawsuit. The only possible motive was to bully the victims into abandoning their legal right to attorney fees. Further, the People argue any federal lawsuit lacked "probable cause," because Morales could have no possible grounds for a lawsuit against the parties for collecting their court-ordered attorney fees.

However, it was the people's burden to prove an unlawful injury and not defendant's burden. "[U]nder the due process guarantees of both the California and

41

United States Constitutions, the prosecution has the burden of proving beyond a reasonable doubt each essential element of the crime [citation], the jury may find for the defendant even if the only evidence regarding an element of the crime favors the prosecution, but that evidence nevertheless falls short of proving the element beyond a reasonable doubt." (*People v. Flood* (1998) 18 Cal.4th 470, 481.) Again, the jurors were instructed they must find that defendant threatened to "unlawfully" injure the victims. Further, they were instructed that "Threatening to do something that a person has a legal right to do is not a threat to commit an unlawful injury."[8]

No evidence was presented to the jury that the threat to file a federal lawsuit was in fact unlawful. The prosecutor only argued that Morales sent an email threatening to file a federal stalking lawsuit if they tried to collect the attorney fees. No evidence was presented that Morales could not legally file such lawsuit. The People's claims that Morales threatened a "frivolous lawsuit" and the fact that Morales articulated no basis for his lawsuit does not support the extortion convictions. The People had to present evidence that Morales threatened an unlawful injury; there was no evidence from which the jury could conclude that Morales's federal lawsuit was unlawful. As such, counts 45 through 50 are reversed.

---

[8] While the instructions did not list counts 45 through 50 the jury could reasonably conclude the extortion by threatening letter instructions applied to those counts.

## C.  INSTRUCTIONAL ERROR—COUNTS 40 AND 42

As conceded by defendant, the convictions in counts 40 and 42 could be supported by substantial evidence.  Count 40 involved the threat of criminal action made to Rosie Q.; and count 42 involved the potentially baseless complaint filed against Janet M. where it was shown Arias was never in her salon on the date alleged.  Nonetheless, Morales claims that these extortion convictions must be reversed because the jury was presented with an invalid legal theory for these charges.  We agree.

Extortion by letter can be based on several types of conduct including to accuse the individual threatened of a crime or "expose, or to impute to [the victim] a deformity, disgrace, or crime."  (§§ 519, 523, subd. (a).)  While the jury could have found Morales improperly threatened Rosie of a crime, the jury was not advised that Morales could be convicted under this theory.  The jury was instructed on one theory for extortion for all counts.  They were advised as an element of the extortion for both counts 40 and 42 that "The defendant threatened to unlawfully . . . injure the other person or the property of the other person."  The only definition of unlawful injury given to the jury was the gender discrimination law and the prosecutor argued to the jury that the lawsuits were valid.  At no time was the jury advised they could find defendants guilty of extortion against Rosie based on an alternative basis—that defendants accused her of a crime.

Further, although the jury could have found the lawsuit against Janet was baseless, the jury was only instructed that the lawsuits were unlawful because the salon charged a different price for the haircuts based on time and skill.  As stated *ante* this was improper.

43

The jury was not instructed that it could consider the complaint was false based on Arias not receiving a haircut at all.

Such instructional error was prejudicial as no other instructions provided this information to the jury. "When such error consists of a failure to instruct on an element of a charge or amounts to an instruction of a legally incorrect theory, the judgment must be reversed unless the People prove beyond a reasonable doubt that the error did not contribute to the verdict in the case at hand; one way to meet this burden is to show from the verdicts that the jury necessarily found all the elements required to convict under a proper theory." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 884.) Since the jury was not given any other instructions on what constituted an unlawful injury, the convictions in counts 40 and 42 are reversed.[9]

D.     ATTEMPTED THEFT AND BURGLARY CONVICTIONS—COUNTS
        1, 4-5, 8-9, 12-13, 16-17, 20-21, 24-25, 27-28, 30-31, 33, 35, 37-38, 41, 44

Morales contends that if this court reverses his extortion convictions, the burglary and attempted theft convictions must be reversed. Arias contends there was insufficient evidence presented that she aided and abetted the burglary and attempted theft. Morales further contends that if this court does not reverse the extortion convictions, the burglary

---

[9] Based on the fact substantial evidence was introduced that could have supported Morales's extortion convictions for counts 40 and 42, and reversal is based on the counts being presented to the jury on an invalid legal theory, he could be retried on these counts at the discretion of the People. (See *People v. Hallock* (1989) 208 Cal.App.3d 595, 610 [Retrial permitted after instructional error found because "[t]here was sufficient evidence presented at trial to convict defendant of the charged offense and, therefore, retrial on that charge will not violate double jeopardy"]; see also *People v. Morgan* (2007) 42 Cal.4th 593, 613.)

convictions are not supported by the evidence as he did not intend to commit a felony or theft in the business premises.

When discussing the sufficiency of the evidence to support burglary and attempted theft during the hearing on the section 1118.1 motion, the prosecutor stated that the burglary and attempted grand theft were all based on the extortion, which was based on the filing of the summons and complaint in the gender discrimination lawsuits. It was unlawful because of the scheme Morales set up before entering the businesses.

On appeal, the People contend "through their lawsuits," defendants expressed an opinion that the victims had broken the law. The People insist that the opinion was based on a "misrepresentation" of fact that the business owners told Arias she was being charged differently because she was a woman, which the victims adamantly denied at trial. Hence, the jury could reasonably infer that defendants lied about what was told to them by the business owners "in hopes that the victims would not remember what occurred," that the business owners would think they were wrong and quickly settle the case. The People rely solely upon the testimony of the business owners and Morales.

"The crime of theft by false pretenses consists of three elements: (1) the making of a false pretense or representation by the defendant, (2) the intent to defraud the owner of his property, and (3) actual reliance by the owner upon the false pretense in parting with his property." (*People v. Fujita* (1974) 43 Cal.App.3d 454, 467.) "However, in proving attempted theft by false pretenses, no reliance upon the false representation need be shown." (*Ibid.*)

45

Initially, as stated, insufficient evidence was presented to support that the gender discrimination lawsuits were unlawful.  As such, they could not constitute a false representation by the defendants.  Further, the alternative theory posited by the People on appeal is not supported by the evidence.  Morales testified that when he considered whether to file the gender discrimination lawsuits, he only did so "because [the business owners] literally told us that the reason they were charging my then girlfriend, now wife, the price they were charging is because she was a woman and because they charged women more."  Morales later testified, "[T]he three conditions [for filing the lawsuits] were, one, they had to charge the . . . higher price to her than me; they had to tell her that they were charging her because she was a woman.  So if they didn't say that, we didn't sue them."  The business owners testified they never told Arias that she was being charged more because she was a woman.

The People are incorrect that the jury could reasonably conclude Morales had made a false representation of fact in the lawsuits that the business owners had committed a crime and intended, based on the misrepresentation, the parties would quickly settle. The People provide no citations to the record supporting that the lawsuits alleged Arias had been told the price differential was because she was a woman. Further, there was no evidence Morales falsely represented to the business owners directly at the time he was in the salons and dry cleaners, or in talking to them about a settlement, that they had broken the law by telling Arias the prices were based on her being a woman. The People only point to the testimony of Morales and business owners to support the claim Morales made this false representation to the business owners. No testimony supports such representation was made directly to the business owners by Morales in an effort to get them to part with their money.

Further, the jury was given instructions on theft by false pretenses that in order to find defendants guilty of attempted theft by false pretenses, they must find "1. The false pretense was accompanied by either a false writing or false token; or [¶] B. There was a note or memorandum of the pretense signed or handwritten by the defendant; or [¶] C. Testimony from two witnesses, or testimony from a single witness, along with other evidence, supports the conclusion that the defendants made that pretense."

As stated, insufficient evidence was presented to support the gender discrimination lawsuits were unlawful. Further, the People do not provide any other evidence of a writing or testimony Morales or Arias represented in either their lawsuits or to the business owners they advised the business owners that the business owners were breaking

47

the law because they told Arias she was being charged more for the services because she was a woman. The People provide nothing to support there was a false representation to the business owners made in the complaint, or directly to the business owners, that Arias was told she paid more because she was a woman and that they must settle the lawsuits because they were breaking the law.

The People have also argued in their brief and at oral argument that count 44, the theft by false pretenses count involving Visage Hair/Janet M., in which Arias never entered the salon on the date alleged in the complaint for gender discrimination, can be retried. We have concluded the prosecution's theory that the false pretense was Morales and Arias advising the business owners that they were breaking the law by telling Arias they were charging more because she was a woman in order to get them to settle the lawsuits, was not supported by the evidence. However, if the jury had been properly advised as to count 44 they could have found the false pretense being that Arias never entered the hair salon, but she and Morales stated they had been in the salon and the salon charged more because Arias was a woman, in order to get Janet M. to settle the lawsuit—it could support the charge. As such, we agree that such charge could be retried.

The People further argue that since the jury could have found defendants guilty of burglary on a theory of either extortion or theft by false pretenses, that the burglary convictions are supported by substantial evidence. Since this court has reversed the extortion counts, the burglary counts are not supported on the theory of extortion. The People contend the burglary convictions can be upheld on the alternative theory of theft.

48

The People insist, "Upon entering, they got haircuts or cleaning services to facilitate their false claim that Arias was told she was charged more because she was a woman."

The jury was instructed on the elements of burglary that the People must prove: "1. The defendant entered a building; and [¶] 2. When he or she entered a building, he or she intended to commit theft or extortion by threatening letter; and [¶] [t]he value of the property taken or intended to be taken was more than $950." The jury was further instructed, "A burglary was committed when the defendant entered with intent to commit theft or extortion by threatening letter. The defendant does not need to have actually committed theft or extortion by threatening letter as long as he or she entered with the intent to do so. The People do not have to prove that the defendant actually committed theft or extortion by threatening letter." [¶] The People allege the defendant intended to commit theft or extortion by threatening letter. You may find—you may not find the defendant guilty of burglary unless you all agree that he or she intended to commit one of those crimes at the time of the entry. You do not all have to agree on which one of those crimes he or she intended."

As stated, there is no evidence of a false representation to support theft by false pretenses or extortion. The burglary convictions are not supported by the evidence. We reverse the burglary and attempted theft convictions in counts 1, 4, 5, 8, 9, 12, 13, 16, 17, 20, 21, 24, 25, 27, 28, 30, 31, 33, 35, 37, 38, 41, and 44.[10]

---

[10] As stated, count 44 could be retried under the proper theory.

Morales further contends that the jury was improperly instructed on the hate crime allegation because the jury was not given a definition of "bias motivation." Arias contends that the instructions were misleading and lowered the prosecution's burden of proof. We need not address these issues based on the reversal of the counts upon which the hate crime allegations were found true.

E.      FILING A FALSE INSTRUMENT

Morales contends there was insufficient evidence presented to support his conviction for filing a false instruction in count 43 against Visage Hair/Janet M. He insists that a complaint cannot be considered a false instrument.

The jury was instructed, "Defendant Rogelio Morales is charged in Count 43 with offering a false document for filing, in violation of Penal Code section 115. [¶] To prove the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant offered a false document for filing in a public office in California; [¶] 2. When the defendant did that act, he knew that the document was false; and [¶] The document was one that, if genuine, could be legally filed." They were further instructed, "It is not a defense to the crimes of filing a false document, as charged in Count 43 . . . , that the defendant did not know they were breaking the law or [t]hat they believed their acts were lawful."

The prosecutor argued that Morales put the date of October 5, 2016, on the complaint filed against Janet but the evidence showed that Arias never entered the salon on that date. There was a clear advantage to Morales putting on the different date so that Janet could not defend the charge.

Section 115, subdivision (a) provides "Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony." "The purpose of section 115 is 'to prevent the recordation of spurious documents knowingly offered for record.' " (*People v. Schmidt* (2019) 41 Cal.App.5th 1042, 1056.) "Section 115 can be violated in two ways: (1) by procuring or offering a *false* instrument for filing; or (2) by procuring or offering a *forged* instrument for filing." (*Ibid.*) The purpose of section 115 is to protect the integrity and reliability of public records, and that purpose is served " ' "by an interpretation that prohibits any knowing falsification of public records." ' " (*Hudson v. Superior Court* (2017) 7 Cal.App.5th 999, 1010.)

Here, the prosecution proceeded on the theory that Morales offered a false instrument for filing when he filed a complaint with the incorrect date. There is no precise definition of false instrument. One court has found that a false instrument is one in which the information contained in an instrument is of such a nature that the government is required or permitted by law, statute or valid regulation to act in reliance thereon. (*People v. Powers* (2004) 117 Cal.App.4th 291, 297.)

In *People v. Tate* (1997) 55 Cal.App.4th 663, the court relied upon the statutory purpose of section 115 to conclude that a work referral form, containing the number of community hours a probationer completed, was an instrument under section 115, subdivision (a). (*Tate*, at pp. 665, 667.) In that case, the defendants knowingly lied on their work referral forms about the hours they had completed and filed the form with the

51

court to show they had completed their probation conditions. (*Ibid*.) The court concluded that the forms filed by the defendants were intended to "induce the court to credit them with satisfaction of a probation term they had not satisfied," and concluded that the work referral forms were " 'instruments' " under the meaning of section 115, subdivision (a). (*Tate*, at p. 667.)

In *People v. Hassan* (2008) 168 Cal.App.4th 1306, the parties signed and filed a private marriage certificate certifying that they were living together as husband and wife when they were not. They were convicted of filing a false instrument but contended the marriage license could not be considered an instrument pursuant to section 115. (*Hassan*, at pp. 1310-1312.) The *Hassan* court concluded that "Confidential marriage certificates are 'instruments' within the meaning of section 115, given the requirement that they be recorded, their importance, and the vast legal consequences that flow from them." (*Id.* at p. 1316.)

The California Supreme Court has not adopted a definition of "instrument." In *People v. Murphy* (2011) 52 Cal.4th 81, the court addressed whether a false vehicle report was an instrument. It noted, "There currently is no precise, generally accepted definition of the term 'instrument' for purposes of Penal Code section 115. Early decisions interpreted the term narrowly. *People v. Fraser* (1913) 23 Cal.App. 82, 85, . . . defined an instrument, as used in section 115, as a written and signed agreement, 'delivered by one person to another, transferring the title to or creating a lien on real property, or giving a right to a debt or duty.' Cases following *Fraser* concluded that a variety of documents not meeting this definition were not 'instruments' within the

52

meaning of section 115. (See, e.g., *People v. Fox* (1977) 73 Cal.App.3d 178, 180-182, . . . [affidavit of voter registration]; *People v. Olf* (1961) 195 Cal.App.2d 97, 101, . . . [application for a permit to issue securities].” (*Id.* at p. 92.) The court also recognized that “[m]ore recent cases construing Penal Code section 115, however, have rejected *Fraser*’s definition and have expanded the meaning of ‘instrument’ to include a broader range of documents that are filed or registered with a public entity. (See, e.g., *People v. Hassan* (2008) 168 Cal.App.4th 1306, 1315-1316, . . . [confidential marriage certificates]; [*People v.* ]*Powers*[ (2004)] 117 Cal.App.4th [291,] 294-295, . . . [fishing activity records filed with Dept. of Fish & Game]; *People v. Tate* (1997) 55 Cal.App.4th 663, 667, . . . [work referral forms documenting hours worked by probationer on community service project]; *People v. Parks* (1992) 7 Cal.App.4th 883, 885, . . . [temporary restraining order]; *Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 682, . . . [deed filed by defendant, purporting to convey an easement to herself].)” (*Id* at pp. 92-93.)

The California Supreme Court did not provide a definition of instrument in *Murphy*. Instead, it found “We need not resolve the question of how the term ‘instrument’ should be defined in order to resolve the issue before us. Even assuming, as the People contend, that a certain level of formality is necessary to render a vehicle theft report an instrument, the filing of a false vehicle theft report would commonly violate Penal Code section 115. The form used for the written report in the present case, CHP form No. 180, calls for a signature under penalty of perjury. Although the record does not reveal how frequently the form is used, the form itself states that it is ‘furnished to all

53

peace officers by the California Highway Patrol,' presumably to provide a uniform format for the filing of such reports. The deputy sheriff who took the report from defendant testified that he would fill out such a form whenever someone reported a stolen vehicle. We may reasonably infer that other law enforcement agencies routinely use this form or a similar one. . . . [¶] . . . [¶] Consequently, the filing of a false vehicle theft report in violation of Vehicle Code section 10501 would commonly result in a violation of Penal Code section 115." (*People v. Murphy*, *supra*, 52 Cal.4th at p. 94.)

Here, based on the more expansive definition of section 115, it appears that a false complaint could be considered to be a false instrument. Although defendant contends that the "government" does not rely on a complaint, such filing sets in motion the trial court ordering a response and a possible default judgment if no reply is received. As in *Hassan* the filing of the complaint had "vast legal consequences that flow from them." (*People v. Hassan*, *supra*, 168 Cal.App.4th at p. 1316.)

Further, Morales insists that he did not have the intent to file a false instrument. Section 115 requires the prosecution to prove "that the accused intentionally committed the forbidden act." (*People v. Geibel* (1949) 93 Cal.App.2d 147, 168-169.)

Morales testified that the incorrect date on the complaint against Visage Hair/Janet M. was a typographical mistake. However, the prosecutor argued to the jury that defendant changed the date to keep Janet from being able to defend the allegation. Further, Morales was in the area near Visage Hair on October 5 while Arias was in Riverside, supporting that Morales sought out the Visage Hair salon to target on that day. The jury could reasonably conclude that Morales knew the complaint was false in order

54

to achieve a better result.  The evidence supports defendant's conviction of filing a false instrument.

  F.  <u>RESTITUTION FINES IMPOSED AGAINST MORALES</u>

  Morales makes several claims that the restitution fines imposed were improper, including:  (1) the fines awarded to Luis, Alejandro and Owens were improper as they were awarded restitution that did not result from Morales's criminal conduct against them; (2) the trial court erred in calculating the amount of restitution for the pro bono attorney fees for Owens's representation of the business owners in the gender discrimination lawsuits; (3) the trial court used an improper rate in calculating the value of the aforementioned attorney fees; and (4) restitution for security upgrades made by Sahagun were not properly awarded.  Arias joins in the arguments.

  Initially, since we have reversed counts 1 through 42, and count 44, Arias is no longer responsible for restitution, and the pro bono legal fees for those counts will no longer be required to be paid by Morales.  In addition, since we have reversed the convictions in counts 45 through 50 for the extortion involving Luis, Alejandro and Owens, there is no restitution that needs to be paid for those counts.  Further, with such reversal, we will vacate the sentence imposed and remand to the trial court for resentencing of Morales.  However, we will consider the claim raised by Morales that Sahagun could not be awarded restitution for security upgrades for the stalking count as these issues will need to be resolved upon remand for resentencing.

1. *ADDITIONAL FACTS*

The People filed a sentencing memorandum. They asked for restitution for the losses to the victims, which included attorney fees and security upgrades that Sahagun had installed due to Morales stalking her. Morales was represented for sentencing and filed opposition to the People's request for restitution. Morales objected to paying restitution for security upgrades made by Sahagun because such reimbursement was only available for violent crimes.

The People filed a response to the opposition and argued that attorney fees should be paid pursuant to section 1202.4, subdivision (f)(3)(H). The People filed a chart for each of the expenses incurred by each victim. This included attorney fees paid to Owens and another law firm, Haffif & Associates LLP, at a rate of $350 an hour. Further, Sahagun was entitled to the costs of installing a security system. The total amount sought was $192,615.58.

At sentencing, the trial court awarded $192,615.58, adopting the amounts set forth in the chart provided by the People.

2. *ANALYSIS*

Pursuant to section 1202.4, subdivision (a)(1), "a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." Section 1202.4, subdivision (f), states that, subject to certain exceptions not applicable here, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court

56

order, based on the amount of loss claimed by the victim or victims or any other showing to the court." "The court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so, and states them on the record." (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172.)

When "the propriety of a restitution order turns on the interpretation of a statute, a question of law is raised, which is subject to de novo review on appeal." (*People v. Williams* (2010) 184 Cal.App.4th 142, 146.)

Section 1202.4, subdivision (f)(3), provides in the introductory statement that restitution "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following[.]" (§ 1202.4, subd. (f)(3).) Subdivision (f)(3)(J), provides for restitution for "Expenses to install or increase residential security incurred related to a violation of Section 273.5, or a violent felony as defined in subdivision (c) of Section 667.5, including, but not limited to, a home security device or system, or replacing or increasing the number of locks."

Morales insists that stalking is not a violent crime, and Sahagun was not entitled to reimbursement for the security upgrade. Defendant relies on *People v. Salas* (2017) 9 Cal.App.5th 736, to support his claim that Sahagun's security upgrades could not be reimbursed based on the language of section 1202.4, subdivision (f)(3)(J). In *Salas*, the defendant was convicted of a domestic violence offense that was not a violent felony. The trial court awarded victim restitution for a home security system installed by the victim pursuant to subdivision (f)(3)(J), because the defendant inflicted great bodily

57

injury on the victim. (*Salas*, at p. 740.) The Court of Appeal held, "the trial court erred by treating Salas's offense as a violent felony for purposes of awarding restitution." (*Id.* at p. 741.) The *Salas* court concluded "[t]he statute's plain language and legislative history," supported the holding that "residential security expenses are recoverable under section 1202.4(f)(3)(J) only when they are 'incurred related to a violent felony, as defined in section 667.5, subdivision (c).' " (*Id.* at p. 744.)

In *People v. Henderson* (2018) 20 Cal.App.5th 467 (*Henderson*)[11], the defendant pleaded no contest to charges of stalking, vandalism, and disobeying a court order and the trial court awarded the victim restitution for a residential security system. (Id. at p. 469.) The appellate court found that "The plain language of . . . subdivision (f)(3)(J) requires that where a defendant is convicted of a violent felony, the trial court shall include in the restitution award expenses reasonably incurred by a victim in installing a residential security system. (§ 1202.4, subd. (f)(3)(J).) The statute does not purport to preclude restitution for such installation under other circumstances; in fact, it says nothing about any restriction on restitution whatsoever. Where the mandatory language does not apply—as in this case, because defendant's crimes of conviction were not classified by the relevant statute as violent felonies—the direction to the trial court remains as set forth in the introductory language of section . . . subdivision (f)(3), . . . , that is, to include in its restitution order 'every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following . . . .' [¶] As we have

---

**11** Review was granted in *Henderson* on May 23, 2018; review was dismissed December 12, 2018, S247716

previously held, '[b]ecause the statute uses the language "including, but not limited to" these enumerated losses, a trial court may compensate a victim for any economic loss which is proved to be the direct result of the defendant's criminal behavior, even if not specifically enumerated in the statute.' [Citation.] Thus, where a victim incurs the economic loss of installing a security system as a direct result of a defendant's conduct, the trial court may include that amount in a victim restitution award regardless of the crime of conviction." (*Id.* at pp. 471-472.)

The *Henderson* court distinguished *Salas* finding "[w]e do not disagree that under . . . subdivision (f)(3)(J) restitution is only mandated where the expenses are related to violent felonies. Here, there is no dispute that defendant's offenses do not qualify as violent felonies, thus the restitution order here would not properly fall under subdivision (f)(3)(J). In that regard, this case is distinguishable from *Salas*. *Salas* does not decide whether the restitution order was permissible as an exercise of the trial court's discretion under the broader language of that portion of subdivision (f)(3) quoted, *ante*." (*Henderson*, *supra*, 20 Cal.App.5th at pp. 472-473, fn. and italics omitted.)

We believe that *Henderson* is properly followed and the restitution awarded to Sahagun for security upgrades was proper. As stated, this court will order that the sentence be vacated and order resentencing for Morales. The trial court, if it chooses to impose restitution upon remand, shall do so in accordance with this opinion.

## DISPOSITION

Morales's convictions in counts 1 through 42 and counts 44 through 50 are reversed. We uphold the convictions for Morales in counts 43 and 51 through 63. We

vacate the sentence on counts 43 and 51 through 63, and remand for resentencing on these remaining counts. The matter is remanded for retrial of counts 40, 42 and 44 at the discretion of the People. All counts against Arias are reversed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.