[No. C047790. Third Dist. Apr. 13, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
RAUL UMANA et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, IV, and V of the Discussion.

## Counsel

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Raul Umana.

Eileen S. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant Jessica Langshaw.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Carlos A. Martinez, Jamie A. Scheidegger and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HULL, J.**—Defendants Jessica Langshaw and Raul Umana attempted to extort money and property from a number of men with whom Langshaw had maintained brief sexual relations. They were convicted of multiple counts of attempted extortion (Pen. Code, § 524; further undesignated section references are to the Penal Code), and delivering a threatening writing with intent to extort (§ 523). Langshaw was also convicted of three counts of falsely reporting a crime. (§ 148.5, subd. (a).) Langshaw was sentenced to state prison for seven years eight months and was ordered to pay restitution of $1,600 and victim restitution of $1,550. Umana was sentenced to state prison for five years and was ordered to pay restitution of $600 and victim restitution of $1,550.

Both defendants appeal. Langshaw contends the evidence is insufficient to support her conviction on one count of extortion and one count of sending a threatening letter with intent to extort. She further contends the trial court

improperly admitted evidence of uncharged crimes, gave an improper pin-point instruction, and unlawfully imposed consecutive terms. Umana joins in Langshaw's arguments and further challenges his victim restitution order.

In the published portion of this opinion, we conclude defendants were properly convicted of attempted extortion and sending a threatening letter with intent to extort, notwithstanding the fact Langshaw, at the time the extortion letter was delivered, already had reported to the police that a victim had sexually assaulted her. In the unpublished portion, we conclude Umana's victim restitution order is unlawful but reject defendants' remaining contentions. We therefore affirm the judgments but amend the victim restitution portion of Umana's sentence.

### FACTS AND PROCEEDINGS

From the spring of 2000 through the end of 2001, Langshaw went out with a number of different men, many of whom she had met through an Internet chat room. She engaged in consensual sexual conduct with nearly all of them. Beginning in early 2002, Langshaw and Umana embarked on a scheme to extort money from each of these men by threatening to report that they had sexually assaulted Langshaw. In many cases, they delivered a demand letter to their potential victims. Langshaw also followed through with her threats by reporting the matters to the police and the district attorney.

### A. Jared P.

In the spring of 2000, Langshaw met Jared P. while the two were working at a Bel Air market. Langshaw was 17 years old at the time. Langshaw and Jared went out together five or six times over the next couple of months, during which they engaged in consensual sexual contact three or four times. On at least one occasion, they engaged in sexual intercourse. After a while, Jared began having trouble contacting Langshaw and she appeared no longer to be interested in him.

Sometime later, Langshaw reported to the police that Jared had raped her. She did not mention any other sexual assaults. On January 16, 2002, Detective Peter Willover met with Langshaw and discussed her charges. He talked to Jared about the matter and Jared denied any sexual misconduct. Willover referred the case to the district attorney, who decided not to file charges.

On February 21, 2002, Langshaw and Umana delivered a letter to Jared that read: "I hereby notify you that I am demanding restitution for the damage that I suffered as a result of the rapes you committed against me in May 2000. I am requesting that you pay damages in the amount of $50,000 in weekly installments of $500, as well as a Suzuki motorcycle you own. In addition, I want a verbal apology and a full written confession of all the crimes you committed against me. I wish to receive the first payment on or before February 28, 2002, along with your motorcycle accompanied by the title of ownership.

"I would like to settle this matter in confidence, but I'm prepared to take further action if you wish to dispute my claim. As you know, I've notified the Sacramento Police Department and State District Attorney. I have also made arrangements with an attorney to bring civil charges against you if you refuse to meet the above demands.

"Please understand that I will not hesitate to pursue the matter further if necessary. I will contact you for your decision."

Jared called Willover and told him Langshaw was demanding money. Two to four weeks later, a male called Jared and asked if he was going to abide by the letter. Jared also reported this to Willover.

Langshaw filed a civil suit against Jared on August 6, 2002.

B. *Joshua W.*

Late in 2000, Langshaw began participating in an Internet chat room where she communicated with a number of individuals, including Paul H., Joshua W., Thomas J., Jonathan S., and Justin C. She met some of them in March 2001, when the chat room sponsored an informal gathering at a pizza parlor.

Joshua W. began dating Langshaw before the pizza parlor gathering. On one occasion, she asked him to pick her up late at night. He took her to his house and they went into his bedroom to watch a movie. He kissed her and touched her breasts. She eventually said she was tired and he took her home around 2:00 or 2:30 a.m. Later, they again got together at Joshua's house, where they watched another movie and engaged in more sexual touching. Five days later, Langshaw told Joshua she was too busy to have him in her life.

In March 2002, Joshua's mother received an unsigned letter informing her that her son had sexually assaulted the author and the author would be suing him. The letter further indicated the author might file criminal charges as well.

Langshaw later sued Joshua in small claims court for sexual assault.

### C. *Thomas J.*

Langshaw communicated with Thomas J. for a while through the chat room and then suggested they meet. He picked her up and took her to his apartment. They watched television and then went into his bedroom, where she laid down on top of him. They began kissing and this eventually led to sexual intercourse. Two hours later, Langshaw said she wanted to go home and he took her home. A month later, they went to a movie together. Later still, they saw each other at the pizza parlor gathering. By then, Langshaw and Thomas were no longer dating.

Some time thereafter, Langshaw came to Thomas's house, claimed he had forced himself on her, and demanded a large sum of money. Langshaw said that if he gave her $150,000 she would keep the matter out of court. At the time, there was a car waiting for her in the driveway with another person inside. Thomas told Langshaw he would not pay.

Langshaw filed a police report against Thomas. On January 14, 2002, Langshaw gave a statement to the police in which she alleged Thomas had raped her in April 2001. Umana was with Langshaw but remained outside while she gave her report. She did not mention being raped by anyone else.

### D. *Justin C.*

Justin C. picked Langshaw up and took her to the pizza parlor gathering while he was home for spring break from college. Afterward, he took her to a Denny's restaurant, where he helped her with her accounting homework. They then met others from the chat room at a bowling alley and he eventually took her home. He picked Langshaw up again two days later. They bought ice cream and ate it in the car at a park. He then took her home and hugged her goodbye because he was returning to school. That summer, Justin asked Langshaw to a concert but she declined. He did not have any sexual contact with Langshaw.

On February 5, 2002, a woman approached Justin's father, a professor at California State University, Sacramento, and informed him that his son had broken into her house the prior spring and tried to assault her. She said she wanted to settle the matter quietly. He told her to come back with something in writing and then reported the matter to campus police. He never heard from Langshaw again.

Justin received a letter from Langshaw on February 22, 2002. It read: "I hereby notify you that I am demanding restitution for the damage that I suffered as a result of the sexual assault you committed against me in April 2001.

"I am requesting that you pay damages in the amount of 50,000 U.S. dollars in weekly installments of $500, as well as a written or verbal confession of and apology for the sexual assault you committed against me last April.

"I wish to receive the first payment on or before February 28, 2002.

"I would like to settle this matter in confidence, but I am prepared to take further action if you wish to dispute my claim. I have taken steps to notify the Sacramento Police Department and State District Attorney. I have also made arrangements with an attorney to bring civil charges against you if you refuse to meet the above demand. Please understand that I will not hesitate to pursue this further if necessary.

"I will contact you for your decision."

Justin never heard from Langshaw again.

### E. *Paul H.*

Paul H. is an attorney who met Langshaw at the pizza parlor gathering and, in April 2001, arranged to pick her up for a date. He drove her to his home, where they watched a movie and engaged in sexual touching but no sexual intercourse. Langshaw was a willing participant. Thereafter, they saw each other on occasion for lunch or dinner and continued to converse through e-mails and by telephone.

On December 13, 2001, Paul met Langshaw for dinner and they went back to his house to watch a movie. Langshaw spent the night with Paul and much of the next day. Again they engaged in sexual touching but no intercourse.

A couple of days later, Langshaw arrived unannounced at Paul's doorstep with a stocky Hispanic man to collect some things she had left at his house. She appeared uncomfortable and agitated and he gave her the things. The man asked if anything physical had occurred between Paul and Langshaw. The man commented that Paul had a nice car. A week to a week and a half later, Langshaw called Paul and said she needed to pick up everything he had that related to her, including the hard drive on his computer. She later came and picked up everything but the hard drive, which Paul refused to relinquish.

A few weeks later, on February 12, 2002, Umana delivered a letter to Paul from Langshaw that read: "I hereby notify you that I am demanding restitution for the damage that I suffered as a result of the sexual assault and battery you committed against me on your property . . . on December 13 to 14, 2001. I'm requesting you pay damages in the amount of 15,000 U.S. dollars, as well as the motorcycle that you own. I wish to receive the money on or before February 28, 2002, along with your motorcycle accompanied by the title of ownership.

"I would like to settle this matter in confidence, but I am prepared to take further action. If you wish to dispute my claim, I have contacted the State Bar of California who subsequently provided me with the forms necessary to submit a complaint, and I have also notified the Sacramento County Sheriff's Office and State District Attorney's office. If you refuse to meet the above demands, I will pursue the matter further by way of both criminal and civil charges. I will contact you for your decision."

Langshaw called five or 10 minutes later and asked what Paul planned to do about her demands. He said he was not sure and hung up. The next day, Paul took the letter to a police station and reported that he was being blackmailed.

Langshaw called again about the letter a week to a week and a half later. On February 20, 2002, Langshaw reported to the police that Paul had raped her. Langshaw claimed she failed to report the matter earlier because she was trying to deal with it herself.

At approximately 2:45 a.m. on March 5, 2002, Paul's car was intentionally set on fire.

Langshaw filed a complaint against Paul with the State Bar. She also filed a civil action against him in December 2002.

F. *Jason M.*

Jason M. worked for the radio station that sponsored the chat room where Langshaw met many of her victims. Langshaw began communicating with

Jason when she called into the radio station to request songs. Her conversations with him became suggestive, intimate, and flirtatious. She eventually suggested that they meet and engage in some of the activities she had discussed. In mid-April 2001, he picked her up around 2:00 a.m., after he finished work. They went to a drug store and bought ice cream and whipped cream and drove to his apartment. They ate the ice cream and he gave her a back rub. They eventually engaged in sexual intercourse. After the intercourse, Langshaw asked to be taken home and Jason complied. She refused to give him her telephone number.

In January 2002, Langshaw called Jason at work and asked where he lived and if he was still driving the same car. She accused Jason of taking her innocence.

On February 21, 2002, Langshaw and Umana arrived at Jason's doorstep with a letter. Umana handed him the letter and said "see that you comply." The letter read: "I hereby notify you that I am demanding restitution for the damages I suffered as a result of the rape you committed against me in April 2001. I am requesting that you pay damages in the amount of 150,000 U.S. dollars in weekly installments of $500, as well as a written or verbal confession of and apology for the rape and sexual assault you committed against me last April.

"I wish to receive the first payment on or before February 28th, 2002. I would like to settle this matter in confidence, but I am prepared to take further action if you wish to dispute my claim. I have taken steps to notify the Sacramento Police Department and State District Attorney . . . . Please be advised that pending your decision, your former employer, KWOD 106.5, is prepared to bring charges against you to avoid a lawsuit against themselves.

"I have also made arrangements with an attorney to bring civil charges against you if you refuse to meet the above demands. Please understand that I will not hesitate to pursue this matter further if necessary. I will contact you for your decision."

After Langshaw and Umana left, Umana returned and told Jason that Langshaw would probably accept $50,000 and they would drop the accusations against him if he made a good faith payment.

On March 5, 2002, approximately one-half hour after Paul's car was burned, Jason's car was intentionally set on fire.

The next month, Langshaw filed a civil action against Jason.

### G. *John S.*

Langshaw began dating John S. in June 2001. They went out together five or six times and on each occasion, they had some type of sexual contact. The first time, they went to his house and watched a movie. After the movie, they laid on his bed and engaged in sexual activities, including oral copulation. However, Langshaw refused to engage in sexual intercourse when John told her he did not have a condom. He took her home around 5:00 or 5:30 a.m. They continued to communicate thereafter and met for lunches.

Langshaw sued John in small claims court on February 8, 2002.

In March 2002, John's parents received an unsigned letter informing them that their son had sexually assaulted the author and that she was suing him for sexual battery and false imprisonment. The letter further stated: "I am also considering pressing criminal charges. I have spoken to . . . law enforcement and have been advised as to what my . . . options are . . . . I am going to remain anonymous until everything is finalized, but I want to give you an idea of what you . . . can be expected to [*sic*] in the near future. Thank you for your consideration."

When John read the letter, he suspected it was from Langshaw, because he knew others from the chat room had received similar letters. John called Langshaw and she initially denied sending the letter. However, she later admitted being the author. He asked her what could be done to keep the matter out of court. She requested an apology and $8,000.

### H. *Francis N.*

Francis N. was a teacher at American River College, and Langshaw was one of his students. She did extra credit work for him and they met on occasion for lunch. He once hugged her in class to thank her for her work. On another occasion, Langshaw hugged him and kissed him on the cheek. He asked her to dinner once, but she declined. He never touched her in a sexual manner or talked about sex with her.

Sometime later, Langshaw walked into Francis's class while he was lecturing and gave him a letter. It read: "I hereby notify you that I am demanding restitution for the damage that I suffered—as a result of the sexual assault you committed against me in November 2001. I am requesting that you pay damages in the amount of $75,000. 75,000 U.S. dollars. I wish to—I wish to receive the money on or before February 28th, 2002.

"I would like to settle this matter in confidence, but I am prepared to take further action if you wish to dispute my claim. As you know, I have notified the dean of instructional services and filed a formal complaint against you with American River College. I have also spoken with at [*sic*] Sacramento Police Department and the State District Attorney and am considering proceeding with criminal charges.

"Please be advised that I am working with an attorney to bring civil charges against you. If you refuse to meet the above demands, I will not hesitate to pursue the matter further if necessary.

"I will contact you for your decision."

On February 6, 2002, Langshaw filed a complaint against Francis N. with American River College. Thereafter, he was relieved of teaching duties until the matter could be resolved. The school investigated the matter and was unable to substantiate that any sexual harassment had occurred.

### I. *Other Evidence*

When the police officers involved in Langshaw's various complaints eventually realized she had filed multiple claims of a similar nature, their attention turned to Langshaw and Umana. They conducted a search of the residence occupied by Umana. Officers found documents relating to Langshaw and a typewriter containing a ribbon cartridge that had been used to write demand letters to a number of the victims.

When Langshaw was arrested, she had in her possession a notebook containing a note addressed to Umana saying that she wanted to spend every night with Umana, to be with him forever, and to be his wife. Langshaw also had Umana's name tattooed on her back.

One officer, who was present when Langshaw reported that Thomas J. raped her, testified that he had seen Langshaw and Umana together at a birthday party a year earlier.

### J. *The Defense*

Langshaw testified on her own behalf. Umana did not testify. Langshaw claimed she had strong religious principles and wanted to remain a virgin until marriage. She indicated she met Umana when she was 16 or 17 and denied any romantic relationship with him.

Langshaw claimed Jared P. had forced himself on her. She also claimed she was next sexually assaulted by a man named Michael K., with whom she worked at the time. Langshaw testified that Jason M. had initiated their date together but could not remember what happened, except that afterward she was home throwing up. She claimed Thomas J. had forced himself on her at his residence.

Langshaw testified that she thought Justin C. was gay and agreed to let him take her to the pizza parlor gathering. She stated he kept calling and trying to go out with her thereafter. She next saw him in the hallway of her residence when nobody else was home and she had not heard a knock. She told him to get out and he grabbed her, incidentally touching her breasts.

Langshaw denied spending time with Paul H. in the spring of 2001, but admitted being with him in December. She claimed Paul forced himself on her and would not take her to school when she asked. She testified that Joshua W. and John S. also forced themselves on her. She claimed that Francis N. told her he dreamed of her and wished he were younger. Langshaw asserted Francis put his hand on top of her leg and rubbed it and, on another occasion, walked her to class and tried to kiss her.

Langshaw denied being involved in the burning of Paul H.'s and Jason M.'s cars.

She further testified that, after Paul H. assaulted her, she got her father's gun with the intent to kill herself but Umana intervened. At that point, she decided to do something about the various sexual assaults.

She first went to the district attorney and reported the Jared P. matter. She was told to report it to the police, which she did. She said the police never asked her about other assaults. She next reported the Michael K. and Thomas J. assaults. She later reported Joshua W., but not Justin C. or Francis N.

Langshaw claimed that, when she was told the district attorney would not file charges, she was informed she could file a civil action. She filed several small claims actions. In the process, she obtained a small claims packet of information that mentioned serving a demand letter and requesting money before suing. She indicated the district attorney told her if she could get the men to apologize or admit wrongdoing, he might proceed with criminal charges. Langshaw claimed she delivered the letters not to obtain money but to obtain an admission of misconduct.

Langshaw testified Umana was not involved, that he did not know the contents of the letters and came along only to protect her. She claimed the note found in her possession upon arrest was not a love letter but a list of goals.

Linda Barnard, a marriage family therapist, testified that Langshaw was suffering from rape trauma syndrome.

### K. *Rebuttal*

The district attorney who informed Langshaw that charges would not be filed testified that he did not advise her she should file civil actions and did not tell her he might pursue criminal charges if she could get confessions.

### L. *Conviction*

Langshaw and Umana were convicted of one count each of attempted extortion and sending a threatening letter with intent to extort as to Paul H., Jason M., and Jared P. In addition, Langshaw was convicted of one count each of attempted extortion and sending a threatening letter with intent to extort as to Justin C. and Francis N. Langshaw was also convicted of attempted extortion of John S. and three counts of filing a false police report.

DISCUSSION

## I

*Sufficiency of the Evidence*

Langshaw challenges her convictions on counts 9 and 10, which charged attempted extortion and sending a threatening letter with intent to extort as to Jared P. She contends those convictions are not supported by substantial evidence, because there is no evidence she threatened Jared with *criminal* prosecution. Umana joins in Langshaw's arguments.

The February 2002 letter to Jared P., quoted in full above, indicated that Langshaw was seeking "restitution" for the damages she suffered as a result of the rapes he committed against her. She demanded $50,000 and his motorcycle, as well as an apology and written confession. The letter further stated: "I would like to settle this matter in confidence, but I'm prepared to take further action if you wish to dispute my claim. As you know, I've notified the Sacramento Police Department and State District Attorney. I have also made arrangements with an attorney to bring civil charges against you if you refuse to meet the above demands."

Langshaw argues this letter threatened only a civil action, and she had a right to make such a threat in order to induce a monetary settlement of her sexual battery claims against Jared P. Langshaw cites evidence that, by the time the letter was delivered, Jared was aware she had already reported the matter to the police and the district attorney. Langshaw asserts she had a right to threaten a civil action, because her allegations were true and Jared knew she was a minor at the time they engaged in sexual activities.

The People contend the validity of Langshaw's claim against Jared P. is immaterial to her convictions. We agree. (See *People v. Choynski* (1892) 95 Cal. 640, 642 [30 P. 791]; *People v. Fox* (1958) 157 Cal.App.2d 426, 431 [321 P.2d 103].) " 'Under that kind of menace which consists in a threat of injury to the character of a person, it is entirely immaterial whether such person is guilty or innocent of the crime to be charged. It certainly would be no defense to the accusation of extortion that the charges or publications threatened to be made by the defendant, and by which he obtained valuable property, were true. The truth or falsity of those matters forms no element in establishing the guilt or innocence of a defendant charged with such extortion.' " (*People v. Choynski, supra,* 95 Cal. at pp. 642–643.)

However, as we shall explain, the fact that a conviction for attempted extortion does not turn on whether the conduct threatened to be exposed is true does not resolve the issue before us.

The People contend Langshaw's assertion that she was only serving a demand letter on Jared P. in anticipation of filing a civil suit must be rejected as "highly implausible." They point out that Langshaw made claims of sexual assault by a number of different men, delayed reporting the assaults for many months, and demanded large sums of money. According to the People: "Given that she demanded large sums of money and a motorcycle from [Jared P.], it is highly unlikely the jury believed that she was simply trying to send an authoritative letter."

Even if the jury rejected Langshaw's claim that her intent was to send Jared a prelitigation demand letter, the question remains whether the letter supports a charge of attempted extortion or sending a threatening letter with intent to extort.

"Extortion is the obtaining of property from another, with his consent, or obtaining of an official act of a public officer, induced by wrongful use of force or fear, or under color of official right." (§ 518.) Attempted extortion is defined in section 524 as an attempt, "by means of any threat, such as is specified in Section 519 of this code, to extort money or other property from another." The elements of attempted extortion are "(1) a specific intent to

commit extortion and (2) a direct ineffectual act done towards its commission." (*People v. Sales* (2004) 116 Cal.App.4th 741, 749 [10 Cal.Rptr.3d 527].)

Section 523 proscribes sending a threatening letter with intent to extort. It reads: "Every person who, with intent to extort any money or other property from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519, is punishable . . . ."

Both section 523 and section 524 refer to section 519. It reads: "Fear, such as will constitute extortion, may be induced by a threat, either: [¶] 1. To do an unlawful injury to the person or property of the individual threatened or of a third person; or, [¶] 2. To accuse the individual threatened, or any relative of his, or member of his family, of any crime; or, [¶] 3. To expose, or to impute to him or them any deformity, disgrace or crime; or, [¶] 4. To expose any secret affecting him or them." Only threats that fall within one of these four categories of section 519 will support a charge of extortion. (*People v. Choynski, supra*, 95 Cal. at p. 642.)

The People do not suggest Langshaw's threat, express or implied (see *People v. Choynski, supra*, 95 Cal. at pp. 641–642), falls within the terms of section 519, subdivision 1, that is, a threat to do an unlawful injury to Jared P. or his property. Nor do they argue Langshaw's demand letter threatened to expose or impute to Jared any disgrace, deformity, or crime or to expose a secret involving Jared, within the meaning of subdivisions 3 and 4 of section 519. Rather, the People contend the letter satisfies subdivision 2—a threat to accuse the victim of a crime.

Langshaw contends her letter to Jared P. did not threaten to accuse him of a crime because, at the time, Jared knew Langshaw had already reported the matter to the authorities. He had spoken to a police officer who informed him that he was being investigated for rape. Jared was also aware the district attorney had decided not to press charges. Langshaw argues a conviction for attempted extortion cannot be predicated on a threat to file a civil action.

Langshaw reads both her letter and section 519 too narrowly. The letter demanded that Jared pay Langshaw money. It further stated: "I would like to settle this matter in confidence, but I'm prepared to take further action if you wish to dispute my claim. As you know, I've notified the Sacramento Police Department and State District Attorney. I have also made arrangements with

an attorney to bring civil charges against you if you refuse to meet the above demands." Langshaw indicated she was prepared to take "further action" but did not explain what that action might be. However, the following sentences indicated she had already initiated criminal proceedings and made arrangements to pursue a civil claim. It is reasonable to infer she intended to pursue both options.

This inference is supported by Langshaw's other conduct. Langshaw testified that, after she was told charges would not be filed against Jared, she met with a deputy district attorney to try and change his mind. She testified the deputy district attorney told her the only way charges would be filed was if she could get Jared or the others to apologize or otherwise admit wrongdoing. She said her intent in delivering the letters was to get such an admission. She further testified that, while delivering the demand letters, she was still in contact with the police and the district attorney's office. Finally, Langshaw testified that, in addition to the police and the district attorney, she communicated with the County Board of Supervisors and a California Assembly member about her claims.

■ "It is not necessary that a threat should be apparent from the face of the letter, nor even necessary that it should be implied therefrom. The statute says if the language used is adapted to imply a threat, then the writing is sufficient. Parties guilty of the offense here alleged seldom possess the hardihood to speak out boldly and plainly, but deal in mysterious and ambiguous phrases . . . ." (*People v. Choynski, supra*, 95 Cal. 641–642.)

■ Although section 519, subdivision 2, speaks in terms of *accusing* the victim of a crime, there is no reasonable basis for drawing a distinction between the initial accusation of a crime and continued pursuit of a criminal charge. In *People v. Beggs* (1918) 178 Cal. 79 [172 P. 152], an employee of a store was charged with stealing from his employer. The defendant attorney was hired by the employer and met with the employee at the police station. The defendant learned the employee had $2,500 on deposit in two banks and arranged to meet with the employee in private. The defendant expressed to the employee the seriousness of the charges and said that, unless the employee paid him $2,000, the employee would be sent to prison for seven or 10 years. The employee thereafter arranged for $2,000 to be delivered to the defendant. (*Id.* at p. 81.)

■ On these facts, the state high court affirmed a conviction for extortion. The court stated: "The law does not contemplate the use of criminal process as a means of collecting a debt. To invoke such process for the purpose

named is, as held by all authorities, contrary to public policy." (*People v. Beggs, supra,* 178 Cal. at p. 84.) This is true whether the defendant's use of the criminal process is by way of an initial report or by continued efforts to pursue the prosecution. One may be as readily induced to part with valuable property by a threat by another that the other will continue to pursue a prosecution as by a threat to initiate charges. It is, in either event, use of the criminal process as a means of collecting a debt. Thus, in *Beggs,* the court concluded, "the threats made by defendant *to prosecute* [the employee] therefor unless he paid the value of said goods . . . constitutes the crime of extortion." (*Beggs, supra,* at p. 84, italics added; but see *People v. Anderson* (1925) 75 Cal.App. 365, 374–375 [242 P. 906] [finding insufficient evidence to support a conviction for extortion where criminal charges had already been filed against the victims], disapproved on other grounds in *In re Wright* (1967) 65 Cal.2d 650, 654 & fn. 3 [56 Cal.Rptr. 110, 422 P.2d 998].)

 Because extortion is a specific intent crime (*People v. Sales, supra,* 116 Cal.App.4th at p. 749), guilt depends upon the intent of the person who makes the threat and not the effect the threat has on the victim (*People v. Fox, supra,* 157 Cal.App.2d at p. 430). Based on the totality of the circumstances here, a reasonable jury could conclude Langshaw's letter to Jared P. was intended by her as a threat to pursue both a civil remedy and to continue her efforts to have him held criminally liable with the specific intent to extort money and other property from him. This is sufficient to support a conviction under both section 523 and section 524.

## II

### *Arson Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### Special Extortion Instruction

The jury was instructed on the elements of extortion and attempted extortion. The jury was further instructed on the types of threats that would qualify for extortion under section 519. In particular, the jury was told section 519 includes a threat "[t]o inflict an unlawful injury on the property of the person threatened; or [¶] [t]o accuse the person threatened or a member of

---

*See footnote, *ante,* page 625.

the family of the person threatened of a crime; or [¶] [t]o expose or impute to the person threatened [or] a member of the family of the person threatened any disgrace or crime; or [¶] [t]o expose any secret affecting the person threatened or a member of the family of the person threatened."

The jury was instructed pursuant to CALJIC No. 14.72: "The words unlawful injury may mean an injury which, if inflicted, would create civil liability against the person doing it and would support a civil action against him or her. A threat to do that which one has a legal right to do is not a threat to do an unlawful injury." Over Langshaw's objection, the court also gave an instruction proposed by the prosecution that read: "It is no defense to the charge of attempted extortion or sending a threatening letter that the facts the defendants threatened to reveal are true. Their truth or falsity is not a factor in determining the guilt or innocence of the accused. If the threat is to reveal a crime committed by the victim, for example, the fact that the victim is, in truth, guilty of the crime is immaterial."

Langshaw contends this latter instruction was incorrect because "the truth or falsity of the facts that someone threatens to reveal is a factor in determining whether the defendant had a tenable claim to threaten a civil action." Langshaw argues the prosecution's instruction conflicted with CALJIC No. 14.72 and left the jury with no clear understanding of an element of the offenses. According to Langshaw, if any of the allegations against her victims were true, she could have lawfully instituted a civil action against the perpetrator and this would not support an extortion charge.

There was neither a conflict in the instructions nor a misstatement of the law. CALJIC No. 14.72 defines "unlawful injury" as used in section 519, subdivision 1. It encompasses a physical injury to a person's property. CALJIC No. 14.72 says such injury may be threatened if the person has a legal right to inflict it. The prosecution's instruction applied to the revelation of facts regarding the victim, as specified in section 519, subdivisions 2, 3 and 4. It says the truth of the "facts" threatened to be revealed is not a defense. As explained earlier, this is a proper statement of the law. (See *People v. Choynski, supra,* 95 Cal. at p. 642; *People v. Fox, supra,* 157 Cal.App.2d at p. 431.) There was no instructional error.

**IV–V***

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 625.

## DISPOSITION

The convictions of both defendants on all counts are affirmed. Umana's sentence is modified to reduce the victim restitution fine to $1,000. The trial court is directed to amend Umana's abstracts of judgment accordingly and to forward a copy thereof to the Department of Corrections and Rehabilitation. As so modified, the judgments are affirmed.

Sims, Acting P. J., and Robie, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 19, 2006, S143447.