Filed 1/27/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FALCON BRANDS, INC., et. al., Cross-complainants and Appellants, v. MOUSAVI & LEE, LLP, et. al., Cross-defendants and Respondents. | G059477 (Super. Ct. No. 30-2020-01128818) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Craig Griffin, Judge. Affirmed in part, reversed in part.

Armstrong Law Group and John Armstrong for Cross-complainants and Appellants.

Kaufman Dolowich Voluck, Andrew J. Waxler, Courtney E. Curtis-Ives and Jennifer E. Newcomb for Cross-defendants and Respondents.

*          *          *

Lawyers argue for a living.  Some do more than argue.  They lace their settlement demands with threats.  When does such activity cross the line and become professional misconduct?  That is the fundamental question presented in this case.

Falcon Brands, Inc. and Coastal Harvest II, LLC (collectively Falcon) appeal here from an order granting respondent's special motion to strike both causes of action in Falcon's cross-complaint pursuant to Code of Civil Procedure section 425.16 (the anti-SLAPP law).  The cross-complaint alleges extortion and intentional interference with a contract against attorney Amy Mousavi and her law firm, Mousavi & Lee, LLP (collectively Mousavi).  Falcon argues Mousavi's e-mail settlement demands, described in detail below, which are the focus of Falcon's cross-complaint, were not entitled to protection under the anti-SLAPP law because they constituted illegal attempts to force Falcon into settling the underlying matter. The trial court rejected this argument and granted Mousavi's anti-SLAPP motion.

We reverse as to the first cause of action for extortion because we conclude Mousavi's e-mail settlement demands, when considered in context, were not protected speech in light of the Supreme Court's ruling in *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*).  Rather, Mousavi's escalating series of threats ultimately transformed what had been legitimate demands into something else:  extortion.  We therefore conclude Falcon's first cause of action is not protected by the anti-SLAPP law as a result of the well-established "*Flatley* rule."

We affirm as to the second cause of action, intentional interference with a contract.  That cause of action arises out of Mousavi's actual revelation of damaging information about Falcon to Falcon's merger partner.  Falcon does not contend the revelations were illegal as a matter of law.  The revelations were made in furtherance of Mousavi's contemplated litigation.  The trial court correctly concluded the revelations were protected by the litigation privilege.  Consequently, they are also protected by the anti-SLAPP statute.

2

## FACTS

Falcon is in the cannabis business. Beginning in 2017, Mousavi's client, Nick Honard, worked for Falcon both as a contractor who earned commissions, and as an employee. Honard was fired by Falcon in August 2019. Falcon claims it terminated Honard after it learned he had submitted fraudulent expense reimbursement requests and hired an employee without Falcon's knowledge or authorization.

On September 6, 2019, attorney Mousavi e-mailed a letter to Falcon's counsel, announcing she had been retained to represent Honard with respect to his potential claims for wrongful termination, misclassification of employment, failure to pay compensation, failure to provide employment records and retaliation for actions protected by whistleblower laws. In the e-mail Mousavi requested that Falcon immediately provide her with certain relevant employment records.

On October 8, 2019, Mousavi e-mailed another letter to Falcon's counsel in which she complained she had not received a response to her earlier records request. She then added that if she did not receive a response by the next day, she "will be notifying Harvest Health & Recreation Inc. and Jason Vedadi since they will be acquiring the above named companies and will be named as defendants in the action that I will be filing against all of the above referenced individuals and entities, if we cannot resolve this matter."

In that same e-mail she summarized Honard's claims: "[a]side from failure to provide earning statements, Falcon and/or Coastal Harvest have consistently cheated Mr. Honard out of his commissions by forcing him to give his account information (which he was earning commissions from) to other employees and the Rezaei brothers, reducing his commissions, not paying Mr. Honard his commissions, and taking over the accounts. . . . Falcon and Coastal Harvest have refused to reimburse Mr. Honard for his expenses." "In this correspondence, I am not addressing the wrongful termination and defamation by Mark Malatesta, who on the phone told employees that Mr. Honard was

3

let go because he embezzled from the company.  Should we not resolve our dispute, I will seek compensation for the damages in the complaint."

Mousavi's letter then segued into what it characterized as "BCC Violations."  Under that heading Mousavi alleged this: "It appears that Falcon and Coastal Harvest do not really care about compliance with laws, whether California employment laws, or the requirements of the Bureau of Cannabis Control ("BCC").  I will enumerate some of [the] illegal activities that Falcon and Costal Harvest have engaged in."  Mousavi then itemized eleven allegedly illegal activities engaged in by Falcon:  "Instructions from Mr. Malatesta to Mr. Honard to sell the cannabis on the black market; [¶] - Delivering products to the dispensaries in personal vehicles, instead of secure distribution vehicle; [¶] - Instructions to illegally drop a 'free replacement eighth' to a man from Vacaville; [¶] - *Bribing a [deputy district attorney] when a Falcon employee named Ronald was arrested driving cannabis across the interstate line;* [¶] - Making illegal deliveries, against BCC codes, to Better Health Group, Life Enhancement Services, and Highway 29 in Vallejo, CA; [¶] - Delivery of illegal products to Magnolia Wellness in Oakland, CA; [¶] - Reassignment of a rejected order from Mom n Pops Inc. in Sacramento; [¶] - Giving away non-cannabis products with the purchase of cannabis products; [¶] - Changing and re-labeling the cannabis products; [¶] - Illegal transportation of cannabis and cannabis products to Las Vegas, Nevada; and [¶] - Distribution of cannabis products at the Las Vegas photo shoot."  (Italics added.)

The October 8 e-mail correspondence did not directly link any of the alleged misconduct to Mousavi's settlement demand.  Instead, after listing the purported "BCC Violations," Mousavi summarized her analysis of the damages Honard was entitled to recover from Falcon thusly: approximately $130,000 in commissions—which she trebled citing statutory authority—plus nearly $61,000 in unreimbursed expenses and $40,000 in unpaid salary, all of which totaled just over $491,000.  Mousavi then offered to settle Honard's claims for $490,000.  She required a response to her demand by the

4

next day: "If I don't have a response from you by tomorrow, I have no choice but to contact Harvest Health & Recreation Inc. and file a complaint."

Falcon's counsel responded the next day by cautioning Mousavi against contacting Falcon's merger partner, Harvest Health and Recreation, Inc. (Harvest). Counsel characterized Mousavi's stated intention to contact Harvest as "a tortious attempt to interfere with Falcon's contract and prospective economic advantage," and pointed out that while "Harvest may or may not in the future acquire Falcon," it was not yet an owner of Falcon and thus would not be a proper party to any claim.

Mousavi quickly replied that "since Harvest Health & Recreation Inc. will be a defendant in this case by acquiring Falcon and Coastal Harvest's shares/capital units, and since your clients have not disclosed this dispute to Harvest Health & Recreation Inc. and Jason Vedadi, I will be notifying them of Mr. Honard's claims, before I file a Complaint against your clients and Harvest Health & Recreation Inc."

Falcon's counsel later filed a declaration in opposition to Mousavi's motion to strike in which he stated he had a telephone conversation with Mousavi on October 9. Counsel claimed that during that conversation Mousavi told him that if Falcon did not settle Honard's claims against it, she would inform Harvest that Falcon had engaged in illegal activities in violation of the California Bureau of Cannabis Control's regulations and various statutes regulating cannabis.[1]

---

[1] Mousavi states that she objected to the admissibility of counsel's declaration in the trial court because it failed to demonstrate it was based on counsel's "personal knowledge," and because the statements it attributes to Mousavi were hearsay. We reject both objections. Counsel declares Mousavi made the statements in a telephone conversation with him which inferentially established personal knowledge. The hearsay objection also fails because the statements were not offered for their truth. Mousavi's threatening statements were relevant because they were allegedly made, irrespective of whether they were truthful.

5

On Friday, October 11, Mousavi sent another e-mail to Falcon's counsel: "I have put the attorneys for Harvest Health & Recreation Inc. ('Harvest') on notice about Mr. Honard's claim for wages, *without disclosing other issues mentioned in my letter of October 8, 2019.* However, Harvest has requested that I forward the demand letters I have sent you. *I am planning to e-mail those letters on Tuesday.* Please call me if you have any questions. Thanks." (Italics added.)[2]

Mousavi e-mailed Falcon's counsel again on Tuesday, October 15, stating "[s]ince I have not received a response to my letters, I will move forward accordingly. Does [*sic*] any of you accept service or should I serve your client directly? Please respond. Thanks."

In response to Mousavi's e-mail Falcon's counsel accused her of trying to "extort an undue settlement for Mr. Honard." On October 16, Mousavi replied with another e-mail: "I have been providing you with [an] opportunity to resolve this matter, but all I get from you are threats and evasiveness. I waited patiently to no avail. As stated I will proceed accordingly. *If you want to resolve this matter, now is the time.*" (Italics added.)

The parties failed to reach a settlement; Mousavi thereafter sent Harvest copies of the various settlement demands she had made to Falcon. Harvest subsequently sued to rescind its merger agreement with Falcon, apparently based on the claims of illegal conduct it received from Mousavi.

On January 31, 2020, Mousavi filed Honard's complaint against Falcon, alleging causes of action for failure to pay wages and overtime, failure to reimburse

---

[2]      In her declaration, Mousavi acknowledged sending an e-mail to Falcon's counsel at 5:16 p.m. on October 11, "stating that Harvest was notified of Mr. Honard's wage claims." She failed to mention that the e-mail also included an expression of her intent to "disclos[e] other issues mentioned in my letter of October 8, 2019" to Harvest by sending it copies of her demand letters to Falcon.

expenses, wrongful termination and retaliation, among others. Honard alleged Falcon altered his commission structure during his employment, in retaliation for his refusal to "sell cannabis on the black market." Honard also alleged he was fired for "whistleblowing" two months after he instructed another employee not to participate in a company request to change labels on products because it was illegal and after he notified a member of Falcon's management about the incident. He further alleged that his firing came a couple of hours after he "wrote a text . . . mentioning the Labor Board and BCC" to two members of Falcon's management.[3]

While Honard did allege in his complaint that Falcon engaged in specific illegal activities,[4] he did not affirmatively link those acts to either his wrongful termination or the non-payment of his commissions, salary, or expenses.

Falcon filed its cross-complaint in May 2020, alleging causes of action for extortion and intentional interference with a contract.[5] Falcon specifically alleged Mousavi (1) threatened to report Falcon's alleged criminal acts to its planned merger partner, Harvest, unless Falcon paid $490,000 to settle Honard's claims against it; and (2) executed that threat by "purposely publish[ing] false and embarrassing information to

---

[3] In the text, which is attached as an exhibit to Falcon's cross-complaint, Honard complained he was removed from company "WhatsApp" chats and states that because he had received no response about getting paid the commissions he was owed, he would be contacting the Labor Board. He stated that as a "professional courtesy," he would give Falcon until Thursday to pay him, but if he did not receive the overdue payments outlined in an earlier e-mail, he "will have to get other parties involved starting with the labor board and BCC."

[4] The alleged illegal acts largely mirrored those set forth in Mousavi's October 8 e-mail. To the extent Honard was asked to participate in those activities, the complaint does not allege he refused, or that he engaged in whistleblowing in response to it.

[5] Falcon also sued Honard, but the motion to strike at issue in this appeal was filed by Mousavi only.

7

Harvest and to the general public to damage Falcon financially and with the intention of hurting Falcon['s] positive image in the marketplace."

Falcon alleged that "[a]s a direct and proximate result of cross-defendants' extortion, and of their carrying out their extortionate threats, Harvest sued Falcon to rescind their contract to acquire Falcon, which was valued at over $200,000,000 at the time, and further Harvest now demands repayment of over $51,000,000 that Harvest previously paid to Falcon under the proposed merger in the federal district court in Arizona, claiming, among other things, that Falcon engaged in unlawful cannabis activities."

Mousavi moved to strike the cross-complaint pursuant to the anti-SLAPP law. In support of the motion, Mousavi declared that, after she learned Falcon was involved in a merger with Harvest, she had a good faith reason to inform Harvest about Honard's claims against Falcon because the Corporations Code states the surviving corporation in a merger remains liable for any judgment entered against the disappearing corporation. (Corp. Code, § 1108.) She denied threatening to report Falcon to the Bureau of Cannabis Control, to other law enforcement agencies, or to the media.

Mousavi argued the statements underlying Falcon's causes of action for extortion and intentional interference with a contract were all made in the context of settlement negotiations, and thus they are protected by the anti-SLAPP law. She relied on *Flatley, supra*, 39 Cal.4th 299, to support her contention that extortion by an attorney is committed only if the attorney threatens to file sham police reports and notify the media of the defendant's alleged criminal acts, and at least some of those acts are unrelated to the injuries allegedly suffered by the attorney's client.

Mousavi asserted this case is distinguishable from *Flatley* because "there is absolutely NO evidence of any threats of criminal prosecution or reporting them to any media or authorities. In fact, the Cross-Complaint does not allege any actionable conduct by the Attorneys that would be improper. Additionally, Ms. Mousavi and her firm

8

expressly and affirmatively deny any threats of criminal prosecution, threats of reporting Cross-Complainants to the authorities, or of reporting them to any media." (Bold omitted.)

Mousavi also claimed Falcon could not demonstrate a probability of prevailing on the merits of its causes of action because her statements were made in the context of negotiations to settle contemplated litigation, and thus were absolutely privileged under Civil Code section 47, subdivision (b).

The trial court granted the motion to strike. The court found Mousavi's statements were presumptively protected under the first prong of the anti-SLAPP act because they were made in connection with litigation, but they would not be protected under the *Flatley* rule if they were illegal as a matter of law.

The court then analyzed the legality of the statements. It concluded that, because Mousavi's communications "expressly tie[d] communications with Harvest with the lack of a settlement, the *actus reus* for an attempted extortion has been established." The court nonetheless believed a question of fact remained related to Mousavi's intent to commit extortion because in her declaration she explained she believed she "had every right to communicate with Harvest and demand a settlement."[6]

The court concluded *Flatley* was distinguishable because Mousavi's "threat was to inform only one entity that would, when the merger [was] completed, be directly affected by the threatened lawsuit. Unlike the situation in *Flatley*, the threat to contact Harvest was not 'entirely unrelated' [to] the Cross-defendants' claims. Accordingly, it

---

[6]     The court quotes a statement made in Mousavi's reply brief. However, there is nothing in Mousavi's e-mails to suggest she planned to pursue settlement negotiations directly with Harvest. Instead, she repeatedly stated her plan was to serve the lawsuit, naming both Falcon and Harvest, if her settlement demands were not satisfied.

9

has not been indisputably proven that Cross-Defendants' sent the prelitigation letters with the intent to extort money by fear. Thus, extortion cannot be found as a matter of law."

Turning to the second prong of the anti-SLAPP analysis, the court concluded that Mousavi's statements were protected by the litigation privilege, and Falcon had failed to demonstrate the privilege does not apply. The court then granted Mousavi's anti-SLAPP motion as to both causes of action.

## DISCUSSION

1.      *The Anti-SLAPP Law*

We begin our analysis with another quote from *Flatley*: "[O]ur opinion should not be read to imply that rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing, necessarily constitute extortion." (*Flatley, supra*, 39 Cal.4th at p. 332, fn. 16.) We concur in this observation. The presence or absence of extortion necessarily depends on the facts in a particular case. Having said that, we turn to the difficult issue presented here.

The anti-SLAPP law provides a summary mechanism to test the merit of any claim arising out of a defendant's protected speech or petitioning activities. The law authorizes courts to strike any cause of action which falls within the statute's purview, if the plaintiff cannot demonstrate a probability of prevailing on it. (Code Civ. Proc., § 425.16.) "Attempting to protect against 'lawsuits brought primarily to chill' the exercise of speech and petition rights, the Legislature embedded context into the statutory preamble, 'declar[ing] that it is in the public interest to encourage continued participation in matters of public significance.'" (*FilmOn.com Inc. v. DoubleVerify Inc*. (2019) 7 Cal.5th 133, 143 (*FilmOn.com*).)

"Because our 'primary goal is to determine and give effect to the underlying purpose of' the anti-SLAPP statute," we will "liberally extend the protection

10

of the anti-SLAPP statute where doing so would 'encourage continued participation in matters of public significance,' but withhold that protection otherwise." (*FilmOn.com, supra*, 7 Cal.5th at p. 154.)

When a party moves to strike a complaint on the basis of the anti-SLAPP law, the trial court must engage in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).)

If the court finds the defendant has made that required showing, the burden shifts to the plaintiff to demonstrate "there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1); *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 567-568.)

"An order granting or denying a special motion to strike shall be appealable . . . ." (Code Civ. Proc., § 425.16, subd. (i).) We review either ruling on a de novo basis. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 ["Whether section 425.16 applies and whether the plaintiff has shown a probability of prevailing are both reviewed independently on appeal"].) "While we are required to construe the statute broadly, we must also adhere to its express words and remain mindful of its purpose." (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 864, fn. omitted.)

2.    *The Protected Activity Prong*

A cross-defendant who files an anti-SLAPP motion to strike bears the initial burden of demonstrating that the challenged cause of action arises from protected activity. (*Equilon*, *supra*, 29 Cal.4th at p. 67.) "In deciding whether the 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing

11

affidavits stating the facts upon which the liability or defense is based.'" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79.)

In *Flatley*, the Supreme Court created an addendum to the standard anti-SLAPP analysis. We believe application of the so-called "*Flatley* rule" is dispositive here. Because the facts in *Flatley* bear such a remarkable similarity to those now before us, we quote liberally from the Supreme Court's opinion:

"Plaintiff Michael Flatley, a well-known entertainer, sued defendant D. Dean Mauro, an attorney, for civil extortion, intentional infliction of emotional distress and wrongful interference with economic advantage. Flatley's action was based on a demand letter Mauro sent to Flatley on behalf of Tyna Marie Robertson, a woman who claimed that Flatley had raped her, and on subsequent telephone calls Mauro made to Flatley's attorneys, demanding a seven-figure payment to settle Robertson's claims. Mauro filed a motion to strike Flatley's complaint under the anti-SLAPP statute. [Fn. omitted.] . . . The Court of Appeal held that, because Mauro's letter and subsequent telephone calls constituted criminal extortion as a matter of law, and extortionate speech is not constitutionally protected, the anti-SLAPP statute did not apply." (*Flatley, supra,* 39 Cal.4th at p. 305.)

The Supreme Court affirmed the judgment of the Court of Appeal: "We conclude that, consistent with the legislative intent underlying the anti-SLAPP statute as revealed by the statutory language, and consistent with our existing anti-SLAPP jurisprudence, a defendant whose assertedly protected speech or petitioning activity was illegal as a matter of law, and therefore unprotected by constitutional guarantees of free speech and petition, cannot use the anti-SLAPP statute to strike the plaintiff's complaint." (*Flatley, supra*, 39 Cal.4th at p. 305.)

Mousavi argued in the trial court that *Flatley* is distinguishable despite the fact that, much like in *Flatley*, Falcon sued Mousavi for extortion and intentional interference with a contract based on the content of a series of increasingly strident

demand letters it received from her. Mousavi echoes the argument made by counsel in *Flatley* that her demands "amounted to no more than the kind of permissible settlement negotiations that are attendant upon any legal dispute . . . ." (*Flatley, supra*, 39 Cal.4th at p. 328.) During oral argument before us, Mousavi's appellate counsel vigorously agreed.

We are not persuaded.

A. *Extortion*

"Extortion is the obtaining of property . . . from another, with his or her consent . . . induced by a wrongful use of force or fear." (Pen. Code, § 518, subd. (a).) Fear, for purposes of extortion "may be induced by a threat of any of the following: [¶] 1. To do an unlawful injury to the person or property of the individual threatened or of a third person. [¶] 2. To accuse the individual threatened . . . of a crime. [¶] 3. *To expose, or to impute to him . . . a deformity, disgrace or crime*. [¶] 4. To expose a secret affecting him, her, or them. [¶] 5. To report his, her, or their immigration status or suspected immigration status." (Pen. Code, § 519, italics added; *Flatley, supra,* 39 Cal.4th at p. 326.)

Attempted extortion is also a crime. (Pen. Code, § 524; see *People v. Umana* (2006) 138 Cal.App.4th 625 (*Umana*) [affirming conviction for attempted extortion under Penal Code section 524].)

As the Supreme Court explained in *Flatley*, "[e]xtortion has been characterized as a paradoxical crime in that it criminalizes the making of threats that, in and of themselves, may not be illegal. '[I]n many blackmail cases the threat is to do something in itself perfectly legal, but that threat nevertheless becomes illegal when coupled with a demand for money.' [Citation.] The extortion statutes 'all adopted at the same time and relating to the same subject matter, clearly indicate that the legislature in denouncing the wrongful use of fear as a means of obtaining property from another had in mind threats to do the acts specified in [Penal Code] section 519, the making of which for the purpose stated is declared to be a wrongful use of fear induced thereby.'"

13

(*Flatley, supra*, 39 Cal.4th at p. 326, fn. omitted.). "Attorneys are not exempt from these principles in their professional conduct." (*Id.* at p. 327.)[7]

The Supreme Court addressed a pivotal argument tendered by Mousavi both in the trial court and before us—that her conduct did not constitute extortion since she threatened no direct disclosure of Falcon's alleged criminal misconduct to either law enforcement or the media. We recognize at this point that this argument will strike a familiar chord with many lawyers who might ask, isn't this type of posturing standard operating procedure for aggressive litigators? Don't lawyers regularly link settlement demands to threatened consequences?

In response, we concur with the answers provided by the Supreme Court in *Flatley*: "threats to do the acts that constitute extortion under Penal Code section 519 are extortionate whether or not the victim committed the crime or indiscretion upon which the threat is based and whether or not the person making the threat could have reported the victim to the authorities or arrested the victim. [Citations.] Furthermore, the crime with which the extortionist threatens his or her victim need not be a specific crime." (*Flatley, supra*, 39 Cal.4th at p. 327.)

In other words, it is the threat to reveal damaging information, not any subsequent revelation, that makes the conduct illegal when the threat is linked to a monetary demand. Many, perhaps most, extortionate threats may never actually be conveyed to either law enforcement or the media. The reason for this is obvious enough: the threat had its desired effect. "[T]he accusations need only be such as to put the intended victim of the extortion in fear of being accused of some crime. The more vague and general the terms of the accusation the better it would subserve the purpose of the accuser in magnifying the fears of his victim, and the better also it would serve to protect

---

[7] California Rules of Professional Conduct, rule 3.10 also prohibits attorneys from making threats "to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."

14

him in the event of the failure to accomplish his extortion and of a prosecution for his attempted crime." (*People v. Sanders* (1922) 188 Cal. 744, at pp. 749-750; cited with approval in *Flatley, supra,* 39 Cal.4th at p. 327.)

Again, it is the fact that the threat is directly linked to the monetary demand that is the critical factor. "'It is the means employed [to obtain the money] which the law denounces, *and though the purpose may be to collect a just indebtedness* arising from and created by the criminal act for which the threat is to prosecute the wrongdoer, *it is nevertheless within the statutory inhibition.*'" (*Flatley, supra*, 39 Cal.4th at p. 326, italics added.)

Applying these rules to the current facts, we believe Mousavi's initial communication with Falcon on September 6, 2019, as described above, was innocent. Her next e-mail sent on October 8, 2019, is a closer call when considered by itself. That e-mail contained at least an implicit threat, as Mousavi specified the crimes Falcon had allegedly committed, though she never directly linked her settlement demands to them. Instead, she explained how she had calculated her client's damages without making any direct reference to the alleged criminal misconduct. A skeptical observer might reasonably wonder why Mousavi referenced the "BBC Violations" at all within that demand. Indeed, we share that curiosity. We nonetheless conclude the October 8 correspondence *standing alone* may not have crossed the line into misconduct.

But the October 8 e-mail must be considered in context along with the October 11, 2019 e-mail. In that e-mail Mousavi informed Falcon's counsel she had already "put the attorneys for Harvest Health & Recreation Inc. ('Harvest') on notice about Mr. Honard's claim for wages, without disclosing other issues mentioned in my letter of October 8, 2019." There can be no doubt that bribing a deputy district attorney (as alleged in the October 8 e-email) involves criminal misconduct. Mousavi then added, "Harvest has requested that I forward the demand letters I have sent you. I am planning to

15

e-mail those letters on Tuesday." The implication is clear: settle the case now or Harvest will become aware of Falcon's alleged criminal misconduct next week.

"It is not necessary that a threat should be apparent from the face of the letter, nor even necessary that it should be implied therefrom. The statute says if the language used is adapted to imply a threat, then the writing is sufficient. Parties guilty of the offense here alleged seldom possess the hardihood to speak out boldly and plainly, but deal in mysterious and ambiguous phrases . . . ." (*People v. Choynski* (1892) 95 Cal. 640, 641–642; *Umana*, *supra*, 138 Cal.App.4th at p. 640.)

If Mousavi had not crossed the line earlier, her October 11 e-mail clearly did. As discussed above, Penal Code section 518 outlaws "obtaining of property . . . from another, with his or her consent . . . induced by a wrongful use of force or fear." (Pen. Code, § 518, subd (a).) The statute specifically provides that fear can be created by accusing "the individual threatened. . . of a crime." (Pen. Code, § 519.)

Mousavi's $490,000 settlement demand, as explained in her October 8 e-mail correspondence, was for unpaid wages, commissions, and related expenses. The demand was unrelated to any alleged criminal conduct. Thus, to paraphrase *Flatley*, Mousavi's threat to disclose criminal activity entirely unrelated to her client's damage claim "'exceeded the limits of respondent's representation of his client' . . . . (*State v. Harrington, supra*, 260 A.2d at p. 699 [attorney's veiled threat to have his client in a divorce action inform on her husband to the Internal Revenue Service and Bureau of Immigration and Naturalization supports attorney's conviction of extortion].)" (*Flatley, supra*, 39 Cal.4th at pp. 330-331.)

### B. *Evidence of Extortion*

As the trial court noted, the evidence made clear that Mousavi expressly linked her next potential communication with Harvest—which she knew would inevitably reveal her accusations of criminal misconduct against Falcon—to Falcon's failure to meet her settlement demand. This was extortion: "obtaining of property . . .

from another . . . induced by a wrongful use of force or fear." (Pen. Code, § 518, subd. (a).)

The only remaining issue is raised by the declaration Mousavi filed in support of her anti-SLAPP motion in which she explained why she believed Falcon's pending merger with Harvest justified her plan to inform Harvest about her client's criminal misconduct allegations against Falcon. But, as discussed above, the fact Mousavi may have believed she had a legitimate reason *to forward* that information along to Harvest is a separate issue from whether she had a legitimate reason *to threaten* Falcon that she would do so if her settlement demand was rejected. The extortion arises out of the threat rather than the follow through.

Although statements made in connection with litigation are generally protected under the terms of the anti-SLAPP law, the Supreme Court made it clear in *Flatley* that settlement demands which contain threats may not be afforded protection: "not all speech or petition activity is protected by [Code of Civil Procedure] section 425.16." (*Flatley, supra*, 39 Cal.4th at p. 313.) "The law does not contemplate the use of criminal process as a means of collecting a debt." (*People v. Beggs* (1918) 178 Cal. 79, 84.) "[T]here is no reasonable basis for drawing a distinction between the initial accusation of a crime and continued pursuit of a criminal charge." (*Umana, supra,* 138 Cal.App.4th at p. 640.)

In attempting to distinguish this case from *Flatley*, Mousavi relies on *Malin v. Singer* (2013) 217 Cal.App.4th 1283. But we are bound by *Flatley*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) As codified in Penal Code sections 518 and 519, extortion arises out of the content of the threatened revelation, not the identity of the third party to whom the information would be revealed. Mousavi's threat to inform Harvest about Falcon's alleged criminal activities was clearly calculated to apply maximum settlement pressure on Falcon. As we have observed, Mousavi was thereby attempting to obtain the "property . . . from another . . . by a wrongful use of

17

force or fear." Such conduct falls squarely within the statutory definition of extortion. Consequently, Mousavi's statements which linked Falcon's failure to accept her settlement demands with her potential revelation of its illegal conduct to Harvest do not qualify for protection under the anti-SLAPP law. The motion to strike related to the extortion cause of action should therefore have been denied.

### 3. *The Reasonable Probability of Prevailing Prong*

Because we have concluded that Falcon's extortion cause of action does not arise from conduct protected by the anti-SLAPP law, we need not address the second prong of the anti-SLAPP analysis for that cause of action.

### 4. *Intentional Interference with Contract*

While Falcon nominally challenges the entirety of the court's order granting Mousavi's anti-SLAPP motion, it makes no distinct arguments relating to the cause of action for intentional interference with contract. Its arguments focus solely on whether the court erred in granting the motion with respect to the extortion claim.

Falcon consequently waived any contention that the court erred by also granting the motion with respect to its cause of action for intentional interference with contract.

## DISPOSITION

The order is reversed as to Falcon's cause of action for extortion. The case is remanded to the trial court with directions to deny the special motion to strike as to the

extortion cause of action.  In all other respects the order is affirmed.  The parties are to bear their own costs on appeal.


                                        GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.